# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. 9:11-cv-80601-DMM**
**Consolidated with Case No. 9:11-80638-DMM,**
**Case No. 9:11-80641-DMM**

WINN-DIXIE STORES, INC., *et al.*,

      Plaintiffs,

v.

BIG LOTS STORES, INC., *et al.*,

      Defendants/Third-Party Plaintiffs,

v.

NORTHEAST VENTURE PLAZA I, LLC, *et al.*,

      Third-Party Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

THIS CAUSE comes before the Court for final disposition after a bench trial that was held on May 14, 15, 16, 17, 18, and 22 regarding Plaintiffs' claims for injunctive relief and damages against all Defendants based on Defendants' alleged violations of Plaintiffs' real property covenants running with the land at certain of Plaintiffs' store locations. Subsequent to trial, the parties submitted proposed findings of fact, conclusions of law, and other memoranda and oral argument was presented on August 6, 2012.

Plaintiffs Winn-Dixie Stores, Inc., Winn-Dixie Stores Leasing, LLC, Winn-Dixie Raleigh, Inc., Winn-Dixie Raleigh Leasing, LLC, Winn-Dixie Montgomery, LLC, and Winn-Dixie Montgomery Leasing, LLC ("Plaintiffs" or "Winn-Dixie") own or operate Winn-Dixie grocery stores on leased property located in Florida, Alabama, Mississippi, and Louisiana.

Plaintiffs filed lawsuits against Defendants Dolgencorp, LLC ("Dollar General"), Dollar Tree Stores, Inc. ("Dollar Tree"), and Big Lots Stores, Inc. ("Big Lots") on May 20, 2011 and June 1, 2011, respectively.  (DE 1, Case No. 9:11-cv-80601; DE 1, Case No. 9:11-cv-80638; DE 1, Case No. 9-11-cv-80641).  While the facts and circumstances in each action are specific to the parties and the commercial properties identified therein, Plaintiffs' claims against these Defendants are essentially identical.  In each case, Plaintiffs claim that Dollar General, Dollar Tree, or Big Lots stores co-located in a shopping center with a Winn-Dixie store has "violated" Winn-Dixie's "grocery exclusive"—a clause in Winn-Dixie's commercial lease whereby the shopping center landlord has granted Winn-Dixie the exclusive right to operate as a grocery store in that particular location, subject to certain items, which I will refer to in this Order as "Restricted Products".  Plaintiffs contend that they have negotiated grocery exclusives with their landlords in each of the shopping centers at issue, which they now seek to enforce directly against Defendants.  In each case, Plaintiffs seek damages arising out of the alleged breaches of their grocery exclusives and injunctive relief as an alternative to future damages.

Plaintiffs initially identified 69 Dollar General, 48 Dollar Tree, and 19 Big Lots stores that allegedly violated the restrictive covenant by selling Restricted Products in excess of what is permitted under the terms of Winn-Dixie's grocery exclusive.  Of these original claims asserted, at trial Plaintiffs pursued its rights as to only 51 Dollar General, 32 Dollar Tree, and 14 Big Lots stores.  Therefore this Court must determine whether the 97 Defendant stores at issue in this matter are violating Plaintiffs' restrictive covenants and if so what, if any, relief Plaintiffs are entitled to.

Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and

2

conclusions of law.

## II.     WHETHER WINN-DIXIE'S GROCERY EXCLUSIVES ARE REAL PROPERTY COVENANTS RUNNING WITH THE LAND

Of the 97 Defendant stores still at issue in this case, the operative grocery exclusive

language of 91 of these leases[1] provides:

> Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant.

Despite this restriction, most of Winn-Dixie's leases allow other properties within the shopping

center to sell certain Restricted Products.  Of the 91 typical grocery exclusives at issue in this

case, 41 Dollar General stores[2], 27 Dollar Tree stores, and 10 Big Lots stores are co-located with

a Winn-Dixie lease containing the following exception:

> [E]xcept the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as [an] incidental only to the conduct of another business . . . shall not be deemed a violation hereof.

Of the remaining thirteen stores, five (5) allow other tenants to sell up to 1,000 square

feet of sales area of such items, three (3) allow other tenants to sell up to 400 square feet of such

items, and five (5) do not allow the sale of any such items.   Since the vast majority of the leases

---

[1]     49 of the 51 Dollar General stores, 12 of the 14 Big Lots stores, and 30 of the 32 Dollar Tree stores at issue contain the provided language.

[2]     Winn-Dixie store numbers 622, 629, and 2268 lack the  "as an incidental only to the conduct of another business" language of the standard grocery exclusive.

at issue here involve the same or substantially similar restrictive covenant language, my conclusions presume this standard language is included unless provided otherwise.

The parties do not dispute that Defendants are not parties to these leases containing Plaintiffs' restrictive covenants. Accordingly, in order to be enforceable against Defendants, Winn-Dixie's grocery exclusives must be real property covenants running with the land. The requirements vary by state and therefore should be considered separately.

### A.        FLORIDA, ALABAMA, AND GEORGIA

Most of the Defendant stores at issue in this case are located in Florida.[3]  I previously considered whether Winn-Dixie's grocery exclusives are real property covenants running with the land under Florida law in my orders concerning the parties' summary judgment motions in the respective cases.  (DE169, Case No. 9:11-cv-80601; DE 281, Case No. 9:11-cv-80638; DE 194, Case No. 9:11-cv-80641).  Under Florida law, the elements of a valid and enforceable covenant running with the land are:  (1) the existence of a covenant that touches and involves the land; (2) an intention that the covenant run with the land; and (3) notice of the restriction on the part of the party against whom enforcement is sought.  *Winn-Dixie Stores, Inc. v. Dolgencorp*, 964 So. 2d 261, 265 (Fla. 4th DCA 2007); *Maule Indus., Inc. v. Sheffield Steel Prod., Inc.*, 105 So. 2d 798, 801 (Fla. 3d DCA 1958)  I previously found that Plaintiffs' restrictive covenants in its Florida leases met the first criteria of touching and involving the land since "each exclusive is intended to limit or prohibit the sale of certain items, namely groceries or food, by other tenants

---

[3]        38 of the 51 Dollar General stores and 23 of the 32 Dollar Tree stores at issue are located in Florida.  All 14 Big Lots stores at issue are located in Florida.

in the shopping center." (DE 169 at 7, Case No. 9:11-cv-80601; DE 281 at 7, Case No. 9:11-cv-80638; DE 194 at 7, Case No. 9:11-cv-80641). I also found that the second requirement was met as each of Winn-Dixie's leases at issue here[4] contain a clause stating:

> This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

(DE 169 at 8, Case No. 9:11-cv-80601; DE 281 at 8, Case No. 9:11-cv-80638; DE 194 at 8, Case No. 9:11-cv-80641). Finally, I found that Defendants had actual, constructive, or implied actual notice of the grocery exclusives at each of the locations at issue in this case except as noted otherwise herein. (DE 169 at 9-11, Case No 9:11-cv-80601; DE 281 at 8-9, Case No. 9:11-cv-80638; DE 194 at 9-11, Case No. 9:11-cv-80641). *See Winn-Dixie*, 964 So. 2d at 265 (stating that Florida recognizes actual, constructive, and implied actual notice in cases concerning covenants running with the land). In *Winn-Dixie*, the court found that Dolgencorp had at least implied actual notice of Winn-Dixie's grocery exclusive, stating:

> Dolgencorp was an experienced commercial tenant with 7,800 stores in 32 states, most of which are located in shopping plazas; it often sought exclusives in its own leases . . . . Dolgencorp understood that Winn-Dixie was the anchor tenant at Crest Haven. Dolgencorp was aware that anchor tenants like Winn-Dixie typically secure restrictive covenants in shopping center leases. Under these circumstances, Dolgencorp had the obligation to make further inquiry of the landlord or Winn-Dixie or to examine the shopping center's chain of title to see if Winn-Dixie had recorded its grocery exclusive.

*Winn-Dixie*, 964 So. 2d at 266. Although I previously found that Defendants had actual or constructive notice at most of the locations at issue here, by virtue of their experience, I find that

---

[4]       The lease for Winn-Dixie store 254 does not contain this exact clause, but contains a clause with similar language as discussed *infra* Part V.C.3.

Defendants had at least implied actual notice at all of the Florida locations at issue here except as noted otherwise.[5]

Seven (7) Dollar General stores and six (6) Dollar Tree stores at issue here are located in Alabama and two (2) Dollar Tree stores at issue here are located in Georgia.  Under Alabama law a covenant "runs with the land" if:  (1) it was intended by the parties creating it to run with the land; and (2) it touches and concerns the land.  *See Miller v. Associated Gulf Land Corp.*, 941 So. 2d 982, 985 (Ala. Civ. App. 2005) (citations omitted).  Under Georgia law, a covenant is binding on future successors if the covenant concerns the land or its use and the subsequent grantee has notice of it.  *Hayes v. Lakeside Village Owners Ass'n. Inc.*, 640 S.E.2d 373, 376 (Ga. Ct. App. 2006).  With regard to the notice requirement, "[t]he presence of the recordation of such restrictive covenants would provide constructive notice of the existence of such covenants."  *See Roth v. Connor*, 510 S.E. 2d 550, 556 (1998) (citation omitted).  Recording a restrictive covenant in Alabama is also a valid form of constructive notice.  *See Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So. 3d 226, 237 (Ala. Civ. App. 2010) (finding an individual was "charged by law with notice of the contents of those covenants because the restrictive covenants were recorded in the appropriate probate court").  For the reasons stated above and in my previous Orders (DE 169, Case No. 9:11-cv-80601; DE 281, Case No. 9:11-cv-80638; DE 194, Case No. 9:11-cv-80641), I find that these requirements are met here and that Plaintiffs' restrictive covenants are enforceable against Defendants in Alabama and Georgia.  Winn-Dixie asserts, and Dollar Tree does not contest, that Dollar Tree had actual notice of Winn-Dixie's grocery exclusive at those Dollar Tree stores co-located with Winn-Dixie stores numbers 166, 456, 471, 514, and 599

---

[5]        *See infra* Part V.B.3.b.

located in Alabama and Georgia.  (DE 130 at 8, Case No. 9:11-cv-80638).  With regard to the

remaining Dollar Tree stores in Alabama and Georgia that are co-located with Winn-Dixie stores

numbers 443, 461, and 463, as well as the Dollar General stores located in Alabama, I find that

Defendants had constructive notice of Winn-Dixie's restrictive covenants by virtue of the fact

that Winn-Dixie properly recorded short forms of their respective leases.  (DE 78, Ex. C, Case

No. 9:11-cv-80638).


### B.   LOUISIANA

Dollar General stores numbers 10357, 626, 770, 2685, and 7824 and Dollar Tree store

number 2161 are located in Louisiana.  The requirements for a covenant to run with the land in

Louisiana are different than Florida.  Namely, "[m]erely stating that a contract is to 'run with the

land' does not create immovable rights. . . ."  *U-Serve Petroleum and Investments, Inc. v.

Cambre*, 486 So. 2d 821, 824 (La. 1st DCA 1986).  Rather, for a covenant to run with the land in

Louisiana, it "can be established only by a title. . . . [T]he real obligation must be clearly apparent

from the title documents themselves."  *Leonard v. Lavigne*, 162 So. 2d 341, 342 (La. 1964).  I

previously considered whether the grocery exclusives contained in the Winn-Dixie leases co-

located with the above-referenced Dollar General stores were covenants running with the land.

(DE 513, Case No. 9:11-cv-80601).  I concluded that under Louisiana law Plaintiffs' restrictive

covenants are not enforceable against Dollar General because a "clearly expressed intention" that

a covenant run with the land alone is not sufficient.  (DE 513 in 80601 at 4-5).  This reasoning

extends to Dollar Tree store number 2161 as well.  Accordingly, Winn-Dixie may not enforce its

grocery exclusives against Dollar General stores numbers 10357, 626, 770, 2685, and 7824 and

Dollar Tree store number 2161.

### C.     MISSISSIPPI

Dollar General store 1026 is located in Mississippi.  Under Mississippi law, a covenant must meet three criteria to run with the land:  (1) the covenanting parties must intend that the covenant run with the land; (2) privity of estate must exist between the person claiming the right to enforce the covenant and the person upon whom the burden of covenant is to be imposed; and (3) the covenant must touch and concern the land in question.  *Hearn v. Autumn Woods Office Park Property Owners Ass'n*, 757 So. 2d 155, 158 (Miss. 1999) (citing *Vulcan Materials Co. v. Miller*, 691 So. 2d 908, 913 (Miss. 1997)).  Irrespective of the first and third requirements, it is evident that the third criterion of privity is lacking in this case.  The Mississippi Supreme Court defines privity as "that which exists between lessor and lessee, tenant for life and remainderman or reversioner, etc, and their respective assignees, and between joint tenants and coparceners." *Hearn*, 757 So. 2d at 158.  Winn-Dixie's only relation to the Dollar General store at this location is that they are co-tenants in the same shopping center.  Winn-Dixie and Dollar General are not lessor and lessee, tenant for life and remainderman or reversioner, or joint tenants or coparceners. Accordingly, Winn-Dixie may not enforce its grocery exclusive against Dollar General store number 1026.

## III.     DEFINING THE TERMS OF THE GROCERY EXCLUSIVES

As stated previously, the typical Winn-Dixie grocery exclusive contains the following clause:

Landlord further covenants and agrees not to permit or suffer any property located within the shopping center be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business . . . shall not be deemed a violation hereof.

Prior to trial, much of this litigation focused on the meaning of the terms "staple or fancy groceries" and "sales area."  As discussed further below, I previously issued an order defining these terms.  (DE 317, Case 9:11-cv-80601).  After defining those terms, Winn-Dixie, and consequently the Defendants, shifted their focus to the meaning of the phrases "10% of the square foot area of any storeroom" and "as an incidental only to the conduct of another business."

### A.   STAPLE OR FANCY GROCERIES

The parties disagree over what items the phrase "staple or fancy groceries" prevents other tenants from selling.  Winn-Dixie does not have an official company position regarding the definition of "grocery."  *See* Rhee Dep. at 20.  Furthermore, it is evident that different grocery operators in the United States define the term "grocery" differently.  *See* McNamara Dep. at 43-44.  In fact, Shawn Sloan, Winn-Dixie's Vice President of Retail Operations, testified that the definition of "staple or fancy groceries" will vary from consumer to consumer depending on what that particular individual purchases from a grocery store.  (Trial Tr. 150-52, May 14, 2012).  In this litigation, however, Winn-Dixie argues that the term "staple or fancy groceries" is clear and unambiguous and should be interpreted to include all items listed in the Consumer Expenditure Study (CES) published annually by Progressive Grocer.  (DE 61 at ¶ 19).  Defining the clause as

such would prevent other tenants from selling both food and non-food items, such as paper products and household cleaners.  Defendants, on the other hand, argue that this term is ambiguous and should be interpreted narrowly to include only food items, excluding beverages, snacks, and candy.

Under Florida law, covenants "must be construed in favor of the free and unrestricted use of property, but . . . where the terms of a covenant are unambiguous, the courts will enforce such restrictions according to the intent of the parties, as expressed by the clear and ordinary meaning of the terms used." *Sweeney v. Mack*, 625 So. 2d 15, 17 (Fla. 5th DCA. 1993) (citing *Norwood-Norland Homeowners Ass'n v. Dade County*, 511 So. 2d 1009, 1014 (Fla. 3d DCA 1987)). "Language in a document is ambiguous when its provisions are fairly susceptible to more than one interpretation." *McInerney v. Klovstad*, 935 So. 2d 529, 531 (Fla. 5th DCA 2006) (citations omitted).  I previously considered this matter and determined that the phrase "staple or fancy groceries" is ambiguous since it is not defined anywhere in the lease and can be interpreted in more than one way.   (DE 317 at 4, Case No. 9:11-cv-80601).  Since the phrase "staple or fancy groceries" is followed by several examples of food items, but no non-food items, I found that a reasonable interpretation of the phrase is that the parties intended to limit or prohibit the sale of food items only.  (*Id.*).[6]  Accordingly, I concluded that the restrictive covenant was susceptible to

---

[6]     While not discussed in my previous Order, this Court's finding that staple or fancy groceries should be interpreted to mean food items is supported by many of the leases in this litigation.  Many of Winn-Dixie's leases at issue in this litigation include a provision permitting certain tenants to sell Restricted Products over the typical allowable amount of 500 or 1,000 square feet of sales area.  However, instead of using the term "groceries" or "staple or fancy groceries," which would be consistent with the typical grocery exclusive, to describe the sale of Restricted Products, these leases use the term "food items."  *See, e.g.*, grocery exclusive for Winn-Dixie stores 84, 228, 353, 378, 411, 428, 471, 553, 574, 622, 629, 647, 656, 658, 662, 750, 1431, 1511, 1540 leases.  Thus, while not necessarily dispositive of the intent of the parties,

more than one interpretation and therefore ambiguous.  (*Id.*).

In making the determination that the phrase "staple or fancy groceries" is ambiguous, I distinguished this matter from *Winn-Dixie Stores, Inc. v. 99 Cent Stuff-Trial Plaza, LLC*, 811 So. 2d 719(Fla. 3d DCA 2002) [hereinafter *99 Cent*].  In *99 Cent*, Winn-Dixie brought an action against one of its landlords to enforce the grocery exclusive contained in its lease against a co-tenant.  *Id.* at 721.  Although that matter was unrelated to this action, the grocery exclusive is identical to the standard grocery exclusive at issue here.  The court considered the meaning of the term "groceries" and found that "[t]he commonly recognized definition of the term groceries includes more than just food.  While it may not be easy to pinpoint each item to be considered groceries, that is no reason to ignore a clear and obvious element of the contracts at issue."  *Id.* at 722.  After considering the impact of *99 Cent*, I determined that the underlying facts of the cases were distinguishable and therefore I was not bound to adhere to *99 Cent*'s definition of groceries. I noted in my opinion that this action involves over 100 leases in five different states dating back to 1957, while *99 Cent* involved one lease executed in 1986.[7]  Finding these distinctions between the two cases, and the fact that the offerings of grocery stores and supermarkets has evolved during this same period, I concluded that *99 Cent* was not binding on this matter and that it would be untenable and erroneous to utilize *99 Cent*'s definition of groceries here.[8]

---

these provisions suggest that the parties intended the phrase "staple or fancy groceries" to include only food items.

[7]      In my Order, I incorrectly stated that the lease in *99 Cent* was executed in 1999. (DE 317 at 7, Case No. 9:11-cv-80601).  However, this error does not affect my underlying analysis and determination that this matter is distinguishable from *99 Cent*.

[8]      Plaintiff's expert, Mr. Reynolds, testified concerning how the modern day full-line grocery store evolved from a variety of produce, meat, and fish markets that consumers used to

Having determined that the phrase "staple or fancy groceries" is ambiguous, I then turned my attention to what meaning should be given to the term. "Where the language of a contract is ambiguous or uncertain in meaning, the court may receive evidence extrinsic to the contract for the purpose of determining the intent of the parties at the time they executed the contract." *Elmore v. Enterprises Dev., Inc.*, 418 So. 2d 1078, 1079 (Fla. 4th DCA. 1982). When determining the meaning of the terms of a contract, "the expressed intent of the original parties is the controlling factor." *Imperial Golf Club, Inc. v. Monaco*, 752 So. 2d 653, 655 (Fla. 2d DCA 2000) (J. Altenbernd dissenting). Although Plaintiffs and Defendants clearly maintained their own theories and opinions regarding the meaning of the term "staple or fancy grocery" and offered witnesses to support their theories, they agreed that none of the original parties to the lease were available to testify regarding their intent in using this term. Accordingly, I determined that it was fruitless to consider extrinsic evidence when construing the intended meaning of this term.

With no extrinsic evidence to determine the intent of the original parties to the leases, I was left to determine as a matter of law what meaning should be given to the term "staple or fancy groceries." *See DEC Elec., Inc. v. Raphael Const. Corp.*, 558 So. 2d 427, 428 (Fla. 1990) ("Ordinarily the interpretation of a written contract is a matter of law to be determined by the court."). I noted that under Florida law, restrictive covenants "are strictly construed in favor of

---

rely on to purchase their food. (Trial Tr. 121-22, May 17, 2012). Dollar Tree's expert, Edward McLaughlin, testified that the term "staple or fancy groceries" emerged in the late nineteenth century to describe the emerging food store and what was sold in it. (Trial Tr. 37, May 22, 2012). He noted, "[o]f course, as that store has changed radically in the last 100 years, selling much more than just food, the nature of the stores changed and those terms have really passed out of current usage." (*Id.*). As a result, Mr. McLaughlin testified that it is not possible to offer a precise definition of the term. (*Id.* at 36).

the free and unrestricted use of real property, but effect will be given to the manifest intention of

the parties as shown by the language of the entire instrument in which the covenant appears,

when considered in connection with the circumstances surrounding the transaction." *Moore v.*

*Stevens*, 106 So. 901, 903 (Fla. 1927) (citations omitted).   After noting that covenants retraining

the use of real property are not favored in the law, but that the intent of the parties should be

enforced where possible, I determined that the term should be interpreted to mean food items

since Plaintiffs' grocery exclusive apparently intended to prohibit or limit other stores ability to

sell food.  (DE 317 at 13-14, Case No. 9:11-cv-80601).

During the trial, it came to the Court's attention that there was a dispute as to whether

beverages are included as food items.  It was further questioned whether, if beverages are food

items, whether alcoholic beverages are nonetheless excluded.  I recognized that the term "food

items" is a definition imposed by the Court in defining the term staple or fancy groceries.  In that

context, the Court rules that beverages, including, but not limited to, bottled water, soda, and

energy and coffee drinks, but excluding alcoholic beverages, are included as both staple or fancy

groceries and food items.   Plaintiffs' expert witness, Robert Reynolds, testified that beverages,

snacks, and candy are considered groceries within the grocery industry.  (Trial Tr. 123, May 17,

2012).  Maurice Laliberte, Dollar General's Vice President of Lease Administration, testified that

when he ensures compliance with restrictive covenants in shopping centers where Dollar General

is located, he includes snacks, candy, beverages, carbonated beverages, energy drinks, and water

in his measurements.  (Trial Tr. 25-26, May 17, 2012).  I admit that the distinction between what

is food, or a staple or fancy grocery, and what is not is very near the line.  As Justice Holmes

once noted, this is "the inevitable result of drawing a line where the distinctions are distinctions

of degree; and the constant business of the law is to draw such lines." *Dominion Hotel v. State of Arizona*, 249 U.S. 265, 269, 39 S. Ct. 273 (1919).

### B.    SALES AREA

As stated previously, Winn-Dixie's standard grocery exclusive contains a clause allowing co-tenants to sell a certain amount of Restricted Products.  The typical clause states:

> [E]xcept the sale of such items is not to exceed the lesser of 500 square feet of ***sales area*** or 10% of the square foot area of any storeroom within the shopping center, as incidental only to the conduct of another business . . . shall not be deemed a violation hereof.

(DE 168 at 3-4, Case No. 9:11-cv-80641) (emphasis added).  Like the term "staple or fancy groceries," "sales area" is not defined in any of Winn-Dixie's leases, nor is it defined in the dictionary.  Plaintiffs argue that the term "sales area" includes both the footprint of the display units on which Restricted Products were displayed, plus one half of the adjacent aisle space. Defendants, on the other hand, contended that "sales area" means only the footprint of the display unit, with no aisle space included.  In a previous opinion I determined that Plaintiffs' interpretation of "sales area" was not clear from the leases and looked to extrinsic evidence to determine what the parties intended the term to mean.  (DE 317 at 8, Case No. 9:11-cv-80601).  I concluded that the term was ambiguous because it was susceptible to more than one interpretation and therefore construed the term to include only the footprint of the display unit, excluding aisle space.[9]  (*Id.* at 8-9, 14).  In making this determination, I distinguished this matter

---

[9]    Of note, Kroger's grocery exclusives use a provision which specifically provides that one-half of the aisle space is to be included within a square footage calculation for purposes of a restrictive covenant.  *See* McNamara Dep. at 46.

from *99 Cent*, which interpreted sales area to include aisle space.  (*Id.* at 8).

### C.      10% OF THE SQUARE FOOT AREA OF ANY STOREROOM

Winn-Dixie's standard grocery exclusive also provides that Defendants may not use more than ten percent of the square foot area of any storeroom for the sale of Restricted Products. Initially, Plaintiffs did not focus on this provision of the grocery exclusive and instead focused on the provision which permits Defendants to sell a certain square feet of sales area of Restricted Products.  At trial, Winn-Dixie argued that the 10% provision should be calculated by including one-half of the aisle space surrounding the display units that are used for the sale of the Restricted Products.  (Trial Tr. 14-15, May 15, 2012).  Although Winn-Dixie acknowledges the Court's prior ruling that "sales area" means the footprint of the display unit only excluding aisle space, Winn-Dixie argues that this ruling does not apply to the 10% provision because the provision uses the term "square foot area of the storeroom" and not "sales area."

I find Plaintiffs' argument unavailing.  First, the express terms of the grocery exclusive state that the appropriate measurement is "the lesser of 500 square feet of sales area or ten percent (10%) of the square foot area of any storeroom with the shopping center."  Although the term "sales area" does not expressly appear in the grocery exclusive in relation to the 10% of storeroom provision, the Court finds that the language of the lease itself unambiguously requires the Court to apply its prior ruling regarding "sales area" consistently to both the 500 square feet and 10% of storeroom provisions in the grocery exclusive.  Utilizing one definition for part of this clause, only to discard it in favor of a different definition for another would be nonsensical. For instance, the leases permit Defendants to sell a certain amount of Restricted Products, but

15

notes that "the *sale of such items* is not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom . . . ."  The Restricted Products are necessarily sold in the "sales area," which the Court has already defined as being the footprint of the display unit only.  (DE 365 at 5, Case No. 9:11-cv-80601).  Thus, regardless of the fact that the ten percent provision uses the term "square foot area" to refer to the sale of "such items," interpreting the lease logically and with internal consistency demonstrates that the ten percent limitation must also be used to measure the calculation of "sales area" as defined by the Court as being applicable to the 500 square feet limitation.

Furthermore, to the extent that the parties' differing interpretations of the ten percent provision raise ambiguities, such ambiguities must be resolved in the Defendants' favor.  *See supra* Part III.A.


### D.     AS INCIDENTAL ONLY TO THE CONDUCT OF ANOTHER BUSINESS

At trial, Plaintiffs also advanced a theory of Defendants' liability predicated on the argument that Defendants' sales of Restricted Products were not merely "incidental to their business."  (Trial Tr. 20, May 14, 2012).  Plaintiffs offered expert testimony, investigator testimony, and Winn-Dixie corporate representatives to argue that Defendants' sales of Restricted Products are not incidental to their business and therefore Defendants are in violation of the grocery exclusives irrespective of whether their sales of Restricted Products exceed the square feet sales area and ten percent of storeroom measurements.  Plaintiffs contend that the "incidental only to the conduct of another business" phrase operates as an independent restriction on Defendants' sales of Restricted Products.  Plaintiffs argued at trial that Defendants' sales of

16

Restricted Products are "[n]ot incidental" but rather "an important part of their strategy." (Trial Tr. 149, May 17, 2012). For several reasons, I find that this clause cannot be enforced against Defendants as a separate way of determining a violation of Winn-Dixie's restrictive covenant.

First, I find that there is no merit to Plaintiffs' argument that the parties to the leases intended the "incidental" clause to be a limitation on Defendants' sales of Restricted Products. The clause appears next to two alternative means of measuring the amount of space, or sales area, that Restricted Products may be sold in a given store. This measurement makes sense because it provides a bright line test for making that determination—namely, sales area in amount the lessor of 500 square feet or 10% of the storeroom. This interpretation is consistent with the express terms of the grocery exclusive and with Plaintiff's own prior interpretations in this and prior cases.[10] Accordingly, I find that the "incidental only" language should be construed to be coextensive with or an extension of the other clauses of the restriction and that it refers to the amount of space devoted to selling Restricted Products as being 500 square feet of sales area or "10% of the storeroom."

Second, even assuming that Plaintiffs' interpretation of the incidental clause was intended, the term "incidental" is ambiguous on its face and incapable of being used to enforce the restrictive covenant by itself. No definition is provided in any of Winn-Dixie's leases for the word "incidental," and the term is susceptible of multiple reasonable interpretations. No competent evidence of the contracting parties' intent was submitted as to the meaning of the

---

[10]     For instance, prior to this Court's rulings considering the definitions of staple or fancy groceries and sales area, Mr. Reynolds stated that a dollar store could sell a million dollars worth of product within 500 square feet and it would not be a violation of the grocery exclusive. (Trial Tr. 161, May 17, 2012).

word "incidental" leaving the Court to construe the term on its face in accordance with Florida law.  However, as Mr. Reynolds testified, there is no bright line for the "incidental" standard. (*Id.* at 170-71).  Indeed, when Plaintiff's expert was asked whether it was possible to determine whether the sales were "incidental," Mr. Reynolds testified "I know it when I see it."  (Trial Tr. 163, May 17, 2012).  When asked whether a certain percentage of a store's sales of Restricted Products would be incidental, Mr. Reynolds responded that "[i]t depends on the context in which the products are being displayed and sold."  (Trial Tr. 33, May 18, 2012).  Thus, even according to Plaintiffs' own expert witness, the term is ambiguous on its face.

Since the term "incidental" is ambiguous, as a practical matter it would be impractical, if not impossible, for this Court to enforce such a restriction independent of the other restrictions set forth in Plaintiffs' grocery exclusive.  Fed. R. Civ. P. 65(d) requires that an injunction must "describe in reasonable detail . . . the act or acts restrained or required."  "Rule 65 serves to protect those who are enjoined by informing them of what they are called upon to do or to refrain from doing in order to comply with the injunction . . . .  The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain . . . exactly what conduct is proscribed."  *Hughey v. JMS Development Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (citations omitted).  Absent some standard for determining when Defendants' sales of Restricted Products sales cease to be incidental, any attempt to enforce this provision of the grocery exclusive independent of the other provisions in the grocery exclusive would violate Fed. R. Civ. P. 65(d).  Indeed, this is likely why the drafter of Winn-Dixie's grocery exclusive utilized the sales area limitations in conjunction with the "incidental" phrase.

Accordingly, I find that to have any meaning or practical effect, the "incidental" phrase

must be read in context with the grocery exclusive's prohibition against other tenants operating their businesses as supermarkets or grocery stores.  The "incidental" phrase cannot practicably be enforced as an independent restriction and must be considered as synonymous with the preceding language in Plaintiffs' grocery exclusive.  Consequently, this Court's analysis will focus on whether there is a violation of the sales area and/or 10% restrictions contained in Winn-Dixie's grocery exclusives.

## IV.    DAMAGES

Count I of Plaintiffs' Complaints asserts a claim for damages based on Defendants' alleged violations of Winn-Dixie's grocery exclusives.  For the foregoing reasons, I find that Plaintiffs' count for damages must be denied in its entirety.

### A.    DR. PACEY'S ECONOMIC MODEL AND REGRESSION ANALYSIS

To help prove its claim for damages, Winn-Dixie retained an economist, Dr. Patricia Pacey, to prepare an economic model and regression analysis and testify at trial regarding Plaintiffs' claimed damages.  After Defendants moved to exclude Dr. Pacey's testimony, the Court heard argument and then held an evidentiary hearing on the issues.  The Court received extensive testimony from Dr. Pacey and her partner, Dr. Mark McNulty, as well as from the economist experts retained by Defendants.  As explained in greater detail in my Omnibus Order Concerning Expert Testimony of Dr. Patricia Pacey, I found that Dr. Pacey's economic model and regression analysis would not assist the trier of fact and that her methodology was not sufficiently reliable.  (DE 358, Case No. 9:11-cv-80601).  While I identified a number of

variables contained in her regression that I thought were erroneous, my chief criticisms of Dr.

Pacey's economic model and regression analysis were that it failed to take into account that most

of Defendants' stores are permitted to sell a certain amount of Restricted Products and that there

was not sufficient empirical evidence to show that Defendants were actually causing Winn-

Dixie's damages.

      In addition to these concerns, I also find that Dr. Pacey's method of calculating Winn-

Dixie's damages was insufficient to prove damages under Florida law.  To recover for lost profits

in Florida, a plaintiff must "provide competent evidence sufficient to satisfy the mind of a

prudent impartial person as to the amount of profits lost as a result." *North Dade Community*

*Development Corp. v. Dinner's Place, Inc.*, 827 So.2d 352, 353 (Fla. 3d DCA 2002).   "An

award of lost profits cannot be based on mere speculation or conjecture." *Id.*  "Essential to

recovery, is initial proof of the fact that damage occurred from the defendant's act, not just that it

is not exact as to amount." *Asgrow-Kilgore Co. v. Mulford Hickerson Corp.*, 301 So. 2d 441,

445 (Fla. 1974).  "Not only must the measure of damages be calculable to a reasonable certainty,

but the cause of the loss must not be speculative." *R.A. Jones & Sons, Inc. v. Holman*, 470 So.2d

60, 71 (Fla. 3d DCA 1985).  Rather than focusing her damages analysis on a store-by-store basis

of those Defendant stores actually alleged to have violated Winn-Dixie's restrictive covenants,

Dr. Pacey's model used sales data from 482 Winn-Dixie stores and compared this data with over

12,000 competitor stores, which included Defendant stores not alleged to be violating Winn-

Dixie's grocery exclusives.  Dr. Pacey then came up with Defendant's net impact on Winn-

Dixie's sales across all of the stores at issue in this case.  Dr. Pacey concluded that "the probable

presence of a co-located Dollar General store reduces Winn-Dixie's 'Sales' by 6.5%." (DE 56-1

at 23, Case No. 9:11-cv-80601).  The result, as Dollar General's expert pointed out, was that

Winn-Dixie claimed damages at two of its stores that exceeded the co-located Dollar General

stores total sales.  (DE 358 at 17, Case No. 9:11-cv-80601).  Accordingly, I find Dr. Pacey's

proof of damages are not calculable to a reasonable certainty and are too speculative to be

granted the relief requested.


### B.   WINN-DIXIE'S ESTIMATION OF DAMAGES AT TRIAL WAS ALSO TOO SPECULATIVE AND NOT CAPABLE OF REASONABLE CERTAINTY

Immediately prior to trial, Winn-Dixie filed a Notice Regarding Winn-Dixie's Damages

Claims.  (DE 527, Case No. 9:11-cv-80601).  In it, Winn-Dixie explained that following the

disqualification of Dr. Pacey, it sought to use its internal "competitive data base"[11] and testimony

of its employees to prove damages in accordance with the Court's prior rulings, but could not do

so.  Thus, while still contending that it suffered damages, Winn-Dixie effectively conceded that it

could not prove damages in Count I.

Although certain Winn-Dixie witnesses offered their opinion that Defendants have caused

Plaintiffs' damages, that testimony was hopelessly speculative and therefore Winn-Dixie's

damages claim must fail.  For instance, Shawn Sloan, Winn-Dixie's Vice President of Retail

---

[11]     At trial, Mr. Sloan testified about the competitive database that was maintained by Winn-Dixie.  (Trial Tr. 132, May 14, 2012).  Winn-Dixie began developing the competitive database in 2003.  *See* Retmar Dep. at 16.  This database is maintained internally to measure the impact of competitors opening stores near Winn-Dixie stores.  (Trial Tr. 133, May 14, 2012).  While the database tracks big box stores, such as WalMart, and other grocery stores, such as Publix, the database did not include dollar stores, such as the Defendants, until 2011, just before this litigation started.  "  (Trial Tr. 134-35, 138, May 14, 2012).  Mr Sloan testified that this was the case because a dollar store's impact on Winn-Dixie "wasn't of such a nature that it would directly . . . affect the company's . . . sales."  (*Id.*).

Operations, testified that Winn-Dixie is hurt by competition by any entity in the same shopping center as a Winn-Dixie store.  As Mr. Sloan stated, these stores are "taking away items from our store and putting it into another basket to another operation.  It doesn't matter what it is."  (Trial Tr. 125, May 14, 2012).  Mr. Sloan also testified that he believes that the opening of a "dollar store" negatively impacts the neighboring Winn-Dixie's sales by about five percent.  (*Id.* at 138-139).  However, Mr. Sloan admitted that he did not confirm this figure by checking information available to Winn-Dixie and that he did not distinguish among the different dollar stores that are Defendants in this action.  (*Id.* at 179-80).

Similarly, Scott Fryman, Winn-Dixie's Director of Assert and Property Management, testified about the "gravity model" of determining expected market share for a particular Winn-Dixie store, and explained how the gravity model would account for sales lost to "non-traditional grocery operators, whether it's a standard Target or Walmart or a Dollar Store [sic] or pharmacy or gas station."  (Trial Tr. 2-30, 28, May 15, 2012).  According to Mr. Fryman, current sales lost to non-traditional grocery operators amount to "around 30 percent" of the grocery market share, as compared to "[b]etween 10 and 12 percent back in the 90's."  (*Id.*).  Based on this assessment, Mr. Fryman concluded that dollar stores and other non-traditional grocery operators have negatively impacted Winn-Dixie and other supermarkets.  (*Id*. at 30).

Finally, Robert Reynolds, Plaintiff's expert, testified that violations of grocery exclusives result in lost sales to Winn-Dixie because "[i]f a loaf of bread is bought in a Dollar General store, that loaf of bread will not be bought at a Winn-Dixie store."  (Trial Tr. 152-53, May 17, 2012).  Mr. Reynolds further testified about damages to Winn-Dixie's marketing programs and leasehold value, stating that "[a] Winn-Dixie lease that's co-located with a dollar store is worth less than it

would be if it were not located with a dollar store." (*Id.*).

The testimony of these witnesses concerning Winn-Dixie's alleged damages is unconvincing. First, the testimony is too general, vague, and speculative to sustain Plaintiffs' burden in Count I. *See R.A. Jones & Sons, Inc.*, 470 So.2d at 71. Second, the witnesses failed to differentiate between allowed and prohibited competition. Regardless of how the Court defines Restricted Products, it is undisputed that the exclusives do not restrict the sale of products that fall, for example, under the rubric of "general merchandise" or "health and beauty aids." Additionally, by definition there is an allowable amount of sales area in the grocery exclusives that is for permitted sales. Thus, competition is not only allowed under the grocery exclusives, it is to be expected. Third, Plaintiffs have offered no evidence that any specific amount of damages was proximately caused by any violation by Defendants of an applicable grocery exclusive. *See Asgrow-Kilgore Co.*, 301 So. 2d at 445. At most, Plaintiffs' witnesses talk about dollar stores generically, without any distinction between the individual Defendants. The Defendants' respective stores are distinctive both in their size and offerings. However, Mr. Fryman simply lumped the dollar stores together with all "non-traditional" grocery sellers.

The Court notes that these are many of the same fundamental problems that plagued Dr. Pacey's testimony. Accordingly, the Court finds that Winn-Dixie has failed in its burdens of proof to demonstrate that Dollar Tree's purported violations of grocery exclusives proximately caused Winn-Dixie any damages cognizable at law, and therefore the Court rules in favor of Defendants on Count I.

Furthermore, Plaintiffs claim for punitive damages is denied. Under Florida law, punitive damages are only permitted "if the trier of fact based on clear and convincing evidence finds that

the defendant was personally guilty of intentional misconduct or gross negligence." Fla Stat. § 768.72(2). "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result, and, despite the knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Id.* "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id*; *see also Tiger Point Golf & Country Club v. Hipple*, 977 So. 2d 608, 611 (Fla. 1st DCA 2007) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."). I find that no such conduct has been shown here. The grocery exclusives sought to be enforced against the Defendants are rife with ambiguities and the scope of their restrictions are uncertain at best. Moreover, Plaintiffs did not make a formal demand on Defendants to comply with their grocery exclusives prior to filing this lawsuit. Accordingly, Plaintiffs are not entitled to punitive damages.


## V.   INJUNCTIVE RELIEF

Winn-Dixie's Complaints also assert a count for injunctive relief. In Florida,[12] to obtain injunctive relief a party generally must demonstrate: (1) a clear legal right; (2) the inadequacy of a remedy at law; and (3) that irreparable injury will occur if such relief is not granted. *Lee County, Florida v. Fort Myers Airways, Inc.*, 688 So. 2d 389, 390 (Fla. 2d DCA 1997).

---

[12]   As detailed herein, I did not find injunctive relief appropriate at any of the Defendant stores located outside of Florida.

However, "Florida law has long recognized that injunctive relief is available to remedy the violation of a restrictive covenant without a showing that the violation has caused an irreparable injury—that is, an injury for which there is no adequate remedy at law." *Autozone Stores, Inc. v. Northeast Plaza Venture, LLC*, 934 So. 2d 670, 673 (Fla. 2d DCA 2006). Accordingly, Plaintiffs need only show a clear legal right to injunctive relief and the inadequacy of a remedy at law. Having rejected Plaintiffs' claim for damages as too speculative and considering my skepticism that Plaintiffs could ever provide sufficient evidence to be entitled to an award of damages, I find that a remedy at law is inadequate. *See Liza Danielle, Inc. v. Jamko, Inc.*, 408 So. 2d 735, 739 (Fla 3d DCA 1982) ("We recognize that impossibility of ascertaining the amount of plaintiff's legal damages may establish inadequacy of the legal remedy so as to support an award of injunctive relief . . . .") (citation omitted). Therefore my analysis will focus on whether Plaintiffs have demonstrated a clear legal right to the injunctive relief requested at each of the Defendant stores still at issue in this litigation.[13]

---

[13]     In my Orders on the parties' summary judgment motions, I noted that I was uncertain as to whether the requested injunctive relief would place such a burden on Defendants' ability to compete that the restrictive covenants should not be enforced because doing so would be inequitable. (DE 169 at 19-20, Case No. 9:11-cv-80601; DE 281 at 15-16, Case No. 9:11-cv-80638; DE 194 at 17-18, Case No. 11-cv-80641). *See Liza Danielle, Inc.*, 408 So. 2d at 740 (finding that injunctive relief was inappropriate where a tenant in a shopping center "was required to cease operating its shoe store at the location leased . . . ."). Having considered the matter further, I find that injunctive relief is appropriate at certain Defendant locations. First, Defendants had notice of Plaintiffs' grocery exclusives. Second, Defendants went to great lengths at trial to downplay the importance of the sale of Restricted Products to their business, repeatedly claiming that it is "not their primary business." (Trial Tr. 27, 161-62, May 17, 2012; Trial Tr. 40-41, May 18, 2012). Accordingly, I find that granting the requested injunctive relief would not result in Defendants' being unable to compete or otherwise operate their stores and therefore injunctive relief is appropriate at certain Defendant locations.

A.     PLAINTIFFS' INVESTIGATOR REPORTS

To prove that Defendants are currently violating its grocery exclusives, Winn-Dixie relied on the reports of investigators working for ICS Merrill.  (Trial Tr. 62, May 15, 2012, AM). These investigators were given instructions to go to certain Winn-Dixie locations to determine whether a Defendant store was co-located with it and to take measurements of certain items sold in the Defendant stores.  (*Id.* at 63).  The investigators also took photographs and prepared diagrams of the Defendant stores, puting the information it gathered into a report.  (*Id.*).  Some of the investigators testified at trial regarding their methods and findings, while the parties submitted a proffer concerning what the parties expected to elicit from other investigators at trial. It is evident from the investigators' testimony that these measurements were estimates.  (*Id.* at 80).  Since the investigations were covert, the investigators were not able to measure the space precisely.  Rather, the investigators testified that they measured the length of the aisles by counting floor tiles or their own paces and the width by using their cellular phones, notepads, or forearms.  (*Id.*).  In an effort to be fair, the investigators stated that they were conservative in their measurements.  (*Id.* at 81).  Defendants did not present any evidence of their own regarding the amount of Restricted Products they are selling.  Having considered the testimony of Plaintiffs' investigators along with the proffers offered by the parties concerning the remaining investigators' reports, I find that their measurements are reasonable estimates of the amount of Restricted Products displayed in the Defendants' stores.  However, I also find that a certain allowance for the inexactness of their measurements must be taken into consideration when determining whether to issue an injunction since Plaintiffs must demonstrate a clear legal right to relief.

Although the investigator's reports only measure the violations at a particular point in time, I find that the measurements are reasonable estimates of their current offerings since Defendants' sales of Restricted Products vary very little due to the uniform store stocking procedures used for each store nationwide, including, among other things, store maps, planograms, and point of sale replenishment systems.  (Trial Tr. 9-15, 79-104, May 16, 2012, PM; Trial Tr. 23-24, May 17, 2012; Jason Dep. 8-16, 30-32).[14]  Accordingly, I find that the measurements of Winn-Dixie's investigators' are reasonable estimates of the amount of Restricted Products being displayed and sold by Defendants, unless stated otherwise.[15]

### B.      DOLLAR GENERAL STORES

#### 1.      TWENTY-NINE DOLLAR GENERAL STORES HAVE CLOSED AND THEREFORE WINN-DIXIE IS NOT ENTITLED TO INJUNCTIVE RELIEF AT THOSE LOCATIONS

At the outset, it should be noted that twenty-nine (29) Dollar General stores that Winn-Dixie claims are violating its restrictive covenants are no longer open.  At trial, Plaintiffs offered

---

[14]      For instance, Dollar General's witness, Mr. Laliberte testified:

Dollar General has made tremendous effort in the last four years, certainly since I've been there, to standardize our store operations.  All of those are planogrammed.  The merchandise is slotted per shelf.  The store layouts are standardized so that there is consistency throughout most of the 10,000-store chain.  It gives me confidence to know that most of those restrictions are being complied with and being adhered to.

(Trial Tr. 23-24, May 17, 2012).

[15]      *See infra* Part V.C.2.

no evidence that the following twenty-five (25) Dollar General stores are presently open and co-located with a Winn-Dixie store:  DG 4821/WD 3; DG 1382/WD 30; DG 1421/WD 144; DG 1333/WD 151; DG 7457/WD 167; DG 1095/WD 209; DG 4981/WD 221; DG 7883/WD 305; DG 1456/WD 331; DG 1524/WD 566; DG 7539/WD 577; DG 1322/WD 612; DG 1413/WD 631; DG 7584/WD 639; DG 1493/WD 647; DG 2762/WD 652; DG 10484/WD 654; DG 1389/WD 710; DG 3013/WD 713; DG 1451/WD 723; DG 4444/WD 2213; DG 1402/WD 2260; DG 1522/WD 2268; DG1513/DG 2326; and DG 1649/WD 2342.  Plaintiffs' own chart that was submitted to the Court indicates that these store have been closed or have been re-located such that they could not be co-located with a Winn-Dixie store.  (DE 559, Case No. 9:11-cv-80601).  Additionally, at trial Dollar General's Vice President of Lease Administration, Maurice Laliberte, offered undisputed testimony that four (4) Dollar General stores are not presently open and operating co-located with a Winn-Dixie store.  (Trial Tr. 21-22, May 17, 2012).  These stores are: DG 2363/WD 411; DG 4008/WD 553; DG 4701/WD 649; and DG 9149/WD 750.  Mr. Laliberte noted that Dollar General's leases at these locations had not yet expired and that it would continue to honor its lease obligations through the expiration of the respective lease terms.  (*Id.* at 21).  Although Dollar General could technically move back into these store locations prior to the end of the respective lease terms, Mr. Laliberte testified that these stores will not be reopened at any point in time.  (*Id.* at 22).  Mr. Laliberte's testimony indicated that all Dollar General stores currently co-located with Winn-Dixie have been flagged for relocation due to the hassle and uncertainty associated with this litigation.  (*Id.* at 29).

Under Florida law, "an injunction will not be granted where it appears that the acts complained of have already been committed and there is no showing by the pleadings and proof

that there is a reasonably well grounded probability that such course of conduct will continue in the future." *Dolgencorp, Inc. v. Winn-Dixie Stores, Inc.*, 2 So. 3d 325, 327 (Fla. 4th DCA 2008) (citations omitted).  By virtue of the fact that these stores have closed and there is no indication that they will reopen, I find that Plaintiffs have failed to show the "reasonably well grounded probability" that a violation will continue necessary to warrant an injunction.

## 2.    STORES WITH RESTRICTIVE COVENANTS THAT ARE NOT ENFORCEABLE AGAINST DOLLAR GENERAL

As stated previously, the following six (6) stores are located in Louisiana and therefore Winn-Dixie may not enforce its restrictive covenants against Dollar General there:  DG 10357/WD 1431; , DG 626/WD 1537; DG 770/WD 1540; DG 2685/WD 1572; and DG 7824/WD 1588.  *See supra* Part II.B.  Furthermore, DG 1026/WD 1511 is located in Mississippi and therefore Winn-Dixie may not enforce its restrictive covenant against Dollar General there either.  *See supra* Part II.C.  Accordingly, Winn-Dixie's request for injunctive relief as to these locations is denied.

## 3.    REMAINING DOLLAR GENERAL STORES AT ISSUE

After taking into account the thirty-five (35) Dollar General stores at issue in this case that have either closed or are located in Louisiana or Mississippi, there are only sixteen (16) stores remaining for this Court to consider whether an injunction should issue.

### a.      DG 1420/WD 611

With regard to Dollar General store number 1420, there is an issue as to whether Winn-Dixie's restrictive covenant is applicable to Dollar General.  Plaintiffs' expert witness James Richard Harris testified concerning this matter.  The original Eagle Family Discount Stores, Inc. lease for this location was executed in 1973.  (*See* D.G. Ex. 90).  At some point after the initial lease was entered into by the parties, Dollar General took over the lease.  (Trial Tr. 55, May 16, 2012 a.m.).  Winn-Dixie recorded its short form lease containing its grocery exclusive at this location on April 13, 1992.  (Trial Tr. 55, May 16, 2012 a.m.).  After Winn-Dixie recorded its short form lease containing its grocery exclusive, Dollar General made certain modifications to its lease.  (*Id.* at 56-57).  One of these modifications, titled "Lease Modification Agreement #2," was dated July 11, 1994.  (*Id.* at 57).  This modification extended the term, added some common area maintenance charges that were not involved in the original lease, changed the property tax obligation, added some options to renew under specific terms, and altered the original percentage rent provisions.  (*Id.*).  The issue here is whether these modifications resulted in a new lease and if so, whether Winn-Dixie's restrictive covenant is now enforceable against Dollar General.

This Court is unaware of, and the parties did not offer, any Florida cases addressing whether a restrictive covenant is enforceable against a party that made modifications to its lease after the restrictive covenant was recorded.[16]  Nevertheless, I find that the modifications entered

---

[16]      While no Florida law exists on this issue, a New York appellate court considered a similar matter.  *See L'Art de Jewel Ltd. v. Hudson Sheraton Corp., LLC*, 46 A.D. 3d 418 (N.Y. 1st App. Div. 2007) [hereinafter *Hudson*].  In *Hudson*, a hotel entered into an agreement with Landau to use space in the hotel to sell its jewelry, a significant portion of which used 14k gold.  *Id.* at 419.  Ten months after Landau entered its license with the hotel, L'Art de Jewel Ltd. ("L'Art") entered into a lease with the hotel to use store space within the hotel to sell jewelry and other items.  *Id.*  The agreement contained a restrictive covenant "whereby the hotel promised

into by Dollar General and its landlord were not new lease agreements and therefore Winn-

Dixie's grocery exclusive is not enforceable against Dollar General.  "An assignment is a transfer

of all the interests and rights to the thing assigned."  *Lauren Kyle Holdings, Inc. v. Health-*

*Peterson Costr. Corp.*, 864 So. 2d 55, 58 (Fla. 5th DCA 2003).  This is distinguishable from a

novation, which "is a mutual agreement between the parties for the discharge of a valid existing

obligation by the substitution of a new valid obligation."  *Thompson v. Jared Kane Co., Inc.*, 872

So. 2d 356, 361 (Fla. 2d DCA 2004).  To prove a novation, four elements must be shown:  (1)

the existence of a previously valid contract; (2) the agreement of the parties to cancel the first

contract; (3) the agreement of the parties that the second contract replace the first; and (4) the

validity of the second contract."  *Id.*  "[A] novation is a form of affirmative defense, and the

party who advocates a novation has the burden of proving it by clear, satisfactory evidence."

*Sans Souci v. Div. of Fla. Land Sales,* 421 So. 2d 623, 631 (Fla. 1st DCA 1982).  I find that

Plaintiffs have failed to provide sufficient evidence to demonstrate that Dollar General's lease

modifications resulted in a novation, as opposed to a mere modification.

──────────────────

that as long as the plaintiff-tenant was not in default under the lease, the hotel agreed to not rent
any other space in the hotel 'for the sale and/or display of Karat Gold Jewelry, watches and
cultured pearls."  *Id.*  Four years after entering into its lease, L'Art sued the hotel complaining
that Landau was violating its lease by selling 14k gold jewelry and sought an injunction
prohibiting Landau from selling such items.  *Id.*  The court found that "the claim against Landau
was properly dismissed because Landau's license predated plaintiff's lease, and as such, Landau
cannot be held to have notice or be subject to it."  *Id.* at 420.  L'Art argued that despite the fact
that Landau's license preceded L'Art's lease, Landau commenced a new term of its license
thereafter and therefore was put on notice of the terms of the restrictive covenant in its lease.  *Id.*
The court rejected this argument stating that the agreement "between Landau and the hotel
merely amended the existing May 1999 license by extending its term and relocating Landau's
operation in a different part of the hotel's lobby.  As to all other particulars, the May 1999
agreement continued in effect, and governed the rights of the parties in regard to Landau's
operation in the hotel lobby."  *Id.*

Plaintiffs submitted a line of cases in which Florida courts found that alleged modifications to leases were not modifications, but rather new leases, because they contained material alterations. *See Robie v. Port Douglas (Florida), Inc.*, 662 So. 2d 1389, 1391 (Fla. 4th DCA 1995) (stating that "the operative inquiry is whether landlord and tenant continued their relationship under the initial lease either through an extension, a renewal or an option"); *Rauch v. Chama Investments, N.V.*, 641 So. 2d 501, 502 (Fla. 4th DCA 1994) (recognizing cases where "in effect a 'new' lease has been negotiated" because "an extension of that term involves new and different rights and responsibilities of the landlord and tenant"); *Strano v. Reisenger Real Estate, Inc.*, 534 So. 2d 1214, 1215 (Fla. 3d DCA 1988) (finding that a lease modification was in fact a new lease because it contained provisions not present in the original lease, such as cancellation by the landlord, higher rent, and increased acreage); *Bartke's, Inc. v. Hillsborough County Aviation Authority*, 217 So. 2d 885, 887 (Fla. 2d DCA 1969) (finding that an agreement styled "Modification and Extension and Renewal of Lease" was in fact a new agreement). However, I find that these cases should not be extended to this matter. First, none of these cases involve restrictive covenants. Rather, these cases deal with superiority of statutory liens, a real estate broker's right to obtain a commission for a lease renewal, and whether an arbitration agreement from an earlier contract was enforceable. Second, extending these cases to this action by enforcing Winn-Dixie's restrictive covenant against Dollar General at this location would result in consequences that defy logic. It makes no sense for a tenant's restrictive covenant to apply to another tenant that was located in a shopping center twenty years before it simply because it entered into a lease modification altering its rent payments or extending its term. I find that such a result would be illogical and potentially wreak havoc with landlords and tenants

across the state.

### b.   DG 9263/WD 705

From the outset of this lawsuit, Plaintiffs have alleged that the filing of their short form leases has put the Defendants on notice of Winn-Dixie's grocery exclusive provisions. This reasoning is supported by *Winn-Dixie*, 964 So. 2d at 266-67.  Winn-Dixie retained J. Richard Harris to review the public records for the Winn-Dixie stores to determine "[w]hether a Short Form Lease, Memorandum of Lease, Declaration of Restrictions, or other such document is recorded in the public records . . . ."  (DE 61-49 at ¶ 2(a), Case No. 9:11-cv-80601).  In Mr. Harris's affidavit entry for Winn-Dixie store number 705, he only lists the short form lease as support for the notion that Winn-Dixie had recorded documents in the public record that would place Dollar General on notice of a grocery exclusive at this location.  (*Id.* at 14).  At trial, however, Plaintiffs presented evidence of a cross-easement agreement that they allege restricts Dollar General's sale of Restricted Products at Dollar General store 9263.  (Trial Tr. 78, May 16, 2012, AM).  On August 8, 1994, WDHC Venture, landlord for Winn-Dixie store number 705, entered into a Cross Easements and Restrictive Covenants Agreement with B&D Grove Partnership, the once owner of five out-parcels adjoining the WDHC property.  *See* Pl. Ex. 319. The cross-easement provides:

> The parties agree that Winn-Dixie shall have the exclusive right to operate a supermarket within the Shopping Center and that no portion of the Grove parcels attached hereto as Exhibit "B" shall be used, occupied, leased or rented directly or indirectly for occupancy as a supermarket, grocery store, meat market, fish market, fruit or vegetable vendor, bakery, delicatessen, or other business which keeps in stock or sells for off-premises consumption any staple or fancy food as a primary business.

33

On its face, this language differs from the exclusive provision contained within the lease and

recorded short form lease for Winn Dixie store number 705.  It is also clear that Dollar General's

landlord, Sand Dollar, was not a party to this cross-easement agreement, nor was Winn-Dixie.

Although this cross-easement is in the chain of title for this location, I find that *Winn-Dixie*

should not be extended to constitute constructive notice in this case.  Unlike the other short form

leases recorded by Winn-Dixie, this cross-easement would not be discovered by Dollar General

unless it examined the public records for all documents recorded by Winn-Dixie's landlord and

all of Dollar General's landlord predecessors.  I do not think that such a record search was

contemplated by the court in *Winn-Dixie*.  Indeed, Plaintiff's own expert, Mr. Harris, did not at

first discover the cross-easement recorded at this location.  Accordingly, I find that Dollar

General lacked notice of Winn-Dixie's cross-easement and thus it is not enforceable against it.[17]

Even if I found that the cross-easement was enforceable against Dollar General, Winn-

Dixie would not entitled to injunctive relief.  There is no evidence that Dollar General is a

supermarket, grocery store, meat market, fish market, fruit or vegetable vendor, bakery, or

delicatessen.  Thus, whether the restrictive covenant is enforceable against Dollar General

depends on whether it "keeps in stock or sells for off-premises consumption any staple or fancy

food as a primary business."  Plaintiffs' expert, Mr. Reynolds was asked on cross-examination

whether Defendants sell staple or fancy goods, or groceries, as its primary business.  (Trial Tr.

40-41, May 18, 2012).  He responded, "[i]f we accept the definition being its primary line of

---

[17]     Since Dollar General is located on an outparcel, as opposed to in the actual
shopping center, I find that Dollar General lacked implied actual notice as well.

business, and that's what they write on the census forms, I agree with you" that the sale of staple or fancy food is not Defendants' primary business.  (*Id.* at 41).  Mr. Reynolds clarified his comment by stating that the restrictive covenant prohibits other tenants from selling any staple or fancy food "as *a* primary business", that there can be multiple primary businesses of a store, and that if this store is "in fact, selling 25 or 30 percent of its total sales within grocery products, then it certainly would be indicative that this is a primary business of this store."  (Trial Tr. 42, May 18, 2012).  Even if I accepted Mr. Reynolds' interpretation that Dollar General may have more than one primary business, this restrictive covenant is incapable of enforcement under Fed. R. Civ. P. 65(d).  It would be impractical, if not impossible, to enjoin Dollar General from selling Restricted Products as "a primary business" because of this phrase's ambiguous meaning and the restrictive covenant's lack of any guidelines of how to enforce it.  *See supra* Part III.D (discussing why this court cannot enjoin Defendants for having sales not incidental to the conduct of another business).

### c.      DG 7268/WD 123

The grocery exclusive for Winn-Dixie store number 123 provides:

The parties agree that no portion of the Landlord's Remaining Land shall be used, occupied, leased or rented for occupancy or use as:

> (a) A supermarket, grocery, meat market, fish market, or bakery;

> (b) vegetables/fruits/produce vendor, dairy products, frozen foods or other food business which keeps in stock or sells for off-premises consumption any staple or fancy food as a normal primary business;

> (c) photo lab or film development business;

> (d) or bank.

Therefore, the grocery exclusive prohibits co-tenants, including Dollar General, from selling "for off-premises consumption any staple or fancy food as a normal primary business." For the same reasons stated *supra* Part III.D and Part V.B.3.b, I find that this restrictive covenant is incapable of being enforced under Fed. R. Civ. P. 65(d).

### d.   DOLLAR GENERAL STORES NOT VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS

Plaintiffs' investigators offered evidence indicating that Dollar General stores use the following amount of sales area for the sale of Restricted Products:

DG 2965/WD 428: 474 square feet.  (DE 580-9 at 10, Case No. 9:11-cv-80601).

DG 246/WD 478: 463.5 square feet.  (Trial Tr. 82-84, May 15, 2012).

DG 1056/WD 489: 427.8 square feet.  (DE 580-6 at 4, Case No. 9:11-cv-80601).

DG 11814/WD 574: 377 square feet.  (DE 580-9 at 20, Case No. 9:11-cv-80601).

DG 4952/WD 599: 490 square feet.  (DE 580-6 at 14).

DG 1416/WD 622: 478 square feet.  (Trial Tr. 54, May 16, 2012, p.m.).

DG 1541/WD 629: 473.5 square feet.  (*Id.* at 55).

DG 2969/WD 681: 274.5 square feet.  (DE 580-15 at 26).

DG 7376/WD 737: 469 square feet.  (Trial Tr. 57, May 16, 2012, p.m.).

Winn-Dixie's grocery exclusives for the above-mentioned store locations permit Dollar General

to sell Restricted Products in up to 500 square feet[18] of sales area.  Accordingly, it is evident that

even by Plaintiffs' own measurements, Dollar General is not violating the Restricted Product

square footage requirements of Winn-Dixie's grocery exclusives at the above-mentioned

locations.

      Furthermore, Dollar General's respective leases indicate that the size of the individual

storerooms of the above-mentioned stores are as follows:

      DG 2965/WD 428:  9,800 square feet

      DG 246/WD 478:  10,600 square feet

      DG 1056/WD 489:  9,800 square feet

      DG 11814/WD 574:  10,046 square feet

      DG 4952/WD 599: 11,741 square feet

      DG 1416/WD 622:  6,500 square feet

      DG 1541/WD 629:  7,216 square feet

      DG 2969/WD 681:  8,475 square feet

      DG 7376/WD 737:  6,500 square feet

Upon a review of the respective storeroom measurements and the sales area dedicated to the sale

of Restricted Products at each of these locations, it is apparent that none of the above-mentioned

stores are utilizing more than ten percent of their respective storerooms to sell Restricted

Products.  Thus, by Plaintiffs' investigators' own measurements, Dollar General is not violating

Winn-Dixie's grocery exclusives at the above-mentioned nine locations and therefore Winn-

---

[18]      The leases for Winn-Dixie stores 489 and 574 allow co-tenants to sell Restricted
Products in up to 1,000 square feet of sales area.

Dixie has not shown a clear legal right to injunctive relief.

    **e.**  **DOLLAR GENERAL STORES VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT BY LESS THAN FIFTY FEET ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS**

  Plaintiffs' investigators offered evidence indicating that Dollar General stores use the following amount of sales area for the sale of Restricted Products:

  DG 8551/WD 561: 507 square feet.  (DE 580-6 at 9).

  DG 8665/WD 579: 526 square feet.  (Trial Tr. 94-95, May 15, 2012).

Winn-Dixie's grocery exclusives for the above-mentioned store locations permit Dollar General to sell Restricted Products in up to 500 square feet of sales area.  Accordingly, it is evident that by Plaintiffs' investigator's measurements, Dollar General's sales of restricted products at these store locations are in violation of Winn-Dixie's grocery exclusives.[19]  However, as each investigator who testified at trial stated, these measurements are estimates.  (Trial Tr., 80, May 15, 2012).  For instance, Mr. Parke stated that when he investigated Dollar General Store number 8665, he measured the width of the footprint shelves by reaching his arm into the shelf.  (*Id.*).  To measure the length of the footprint shelves, Mr. Parke counted floor tiles, which he testified were one square foot.  (*Id.*).  Mr. Custinger stated at his deposition that when investigating Dollar General store number 8551, he used the length of his stride, floor tiles, and a piece of paper to perform measurements.  (DE 595 at 2-3).  The fact that Mr. Custinger's measurements were

---

   [19]  According to their respective leases, Dollar General store number 561 is 8,640 gross square feet while number 579 is 12,000 square feet.  Thus, neither of these stores is utilizing more than ten percent of their respective storerooms to sell Restricted Products.

estimates is evident by the fact that he measured the gross square footage of Dollar General store number 8551 at 6,000 square feet.  (DE 580-6 at 10).  However, the lease for this store states that the gross square footage is actually 8,640 feet, a difference of 2,640 square feet.  (Dollar General Ex. 84).  Accordingly, I do not think that Dollar General should be enjoined at these locations for selling more Restricted Products than allowed since the margin of error in their measurements calls into question whether Winn-Dixie has a clear legal right to injunctive relief.  However, Dollar General is ordered to measure the amount of space dedicated to the sale of Restricted Products at these store locations within thirty (30) days of the date of this Order to ensure that it is not violating Winn-Dixie's grocery exclusives and to remove Restricted Products from their store if necessary to come into compliance.

f.      **DOLLAR GENERAL STORES VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT BY MORE THAN FIFTY FEET ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS**

Plaintiff's investigators offered evidence indicating that Dollar General stores use the following amount of sales area for the sale of Restricted Products:

DG 1453/WD 662: 612 square feet.  (DE 580-6 at 23).

DG 2634/WD 777:  562.5 square feet.  (DE 580-16 at 55).

Winn-Dixie's grocery exclusives prohibit Dollar General from dedicating more than 500 square feet of sales area to the sale of Restricted Products at these locations.  Thus, I find that Dollar General is in violation of Winn-Dixie's grocery exclusives at these locations and that Plaintiffs have established a clear legal right to injunctive relief.  Accordingly, Dollar General stores 1453

and 2634 are ordered to comply with Winn-Dixie's grocery exclusive by limiting the sale of Restricted Products to 500 square feet of sales area within thirty (30) days of the issuance of this Order.

### C.    DOLLAR TREE STORES

As stated previously, Dollar Tree store 2161 is located in Louisiana and therefore I find that Winn-Dixie may not enforce its grocery exclusive against Dollar Tree at that location.[20]  *See supra* Part II.B.  Furthermore, Winn-Dixie did not submit any evidence that Dollar Tree store number 1135 is violating its grocery exclusive, presumably because the Dollar Tree lease at that location expired on January 31, 2011 and the store permanently closed on April 30, 2011. Therefore I must consider whether Winn-Dixie is entitled to an injunction at any of the remaining thirty (30) Dollar Tree locations at issue in this matter.

### 1.    DOLLAR TREE STORES NOT VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS

Plaintiffs' investigators offered evidence indicating that Dollar Tree stores use the following amount of sales area for the sale of Restricted Products:

WD 84/DT 2804: 231.6 square feet.  (DE 580-2 at 3).

WD 166/DT 582: 245 square feet.  (*Id.* at 8).

---

[20]        Even if Winn-Dixie could enforce its grocery exclusive against Dollar Tree store 2161, I find that Dollar Tree is not entitled to injunctive relief because Plaintiffs' investigator report indicates that it is selling only 339 square feet of sales area of Restricted Products.  (DE 580-11 at 19).

WD 228/DT 1566: 273.2 square feet.  (DE 580-7 at 4).

WD 255/DT 4199: 350.4 square feet.  (DE 580-2 at 16).

WD 309/DT 2159: 360.4 square feet.  (DE 580-7 at 11).

WD 353/DT 2117: 168 square feet.  (DE 580-14 at 3).

WD 378/DT 4497: 235.2 square feet.  (DE 580-14 at 9).

WD 412/DT 2838: 378 square feet.  (DE 580-6 at 25).

WD 443/DT 2160: 298.4 square feet.  (DE 580-5 at 3).

WD 456/DT 4133: 288 square feet.  (DE 580-9 at 25).

WD 461/DT 2395: 285 square feet.  (DE 580-9 at 30).

WD 463/DT 153: 336 square feet.  (DE 580-9 at 35).

WD 471/DT 4637: 336 square feet.  (DE 580-6 at 30).

WD 501/DT 4266: 270 square feet.  (DE 580-6 at 36).

WD 514/DT 3382: 405 square feet.  (DE 580-9 at 40).

WD 577/DT 4625: 522 square feet.  (DE 580-6 at 41).

WD 599/DT 2936: 190.5 square feet.  (DE 580-6 at 47).

WD 632/DT 4339: 449 square feet.  (DE 580-16 at 86).

WD 647/DT 4511: 468 square feet.  (DE 580-16 at 91).

WD 656/DT 4230: 407 square feet.  (DE 580-16 at 96).

WD 657/DT 807: 439 square feet.  (DE 580-16 at 101).

WD 658/DT 4550: 450 square feet.  (DE 580-16 at 106).

WD 678/DT 4181: 357 square feet.  (DE 580-16 at 111).

WD 737/DT 986: 301 square feet.  (DE 580-16 at 116).

WD 2205/DT 2714: 361.5 square feet.  (Trial. Tr. 165, May 15, 2012).

WD 2230/DT 892: 444 square feet.  (DE 580-4 at 3).

WD 2311/DT 332: 361.5 square feet.  (Trial Tr. May, 15, 2012 at 184-85).

Winn-Dixie's grocery exclusives for the above-mentioned store locations permit Dollar Tree to sell Restricted Products in up to 500 square feet[21] of sales area.  Accordingly, it is evident that even by Plaintiffs' own measurements, Dollar Tree is not violating the Restricted Product square footage requirements of Winn-Dixie's grocery exclusive at the above-mentioned locations.

Furthermore, Dollar Tree's respective leases indicate that the size of the individual storerooms are as follows:

WD 84/DT 2804: 10,080 square feet.

WD 166/DT 582: 8,450 square feet.

WD 228/DT 1566: 7,500 square feet.

WD 255/DT 4199: 12,000 square feet.

WD 309/DT 2159: 12,000 square feet.

WD 353/DT 2117: 9,100 square feet.

WD 378/DT 4497: 10,200 square feet.

WD 412/DT 2838: 10, 143 square feet.

WD 443/DT 2160: 10, 512 square feet.

WD 456/DT 4133: 8,300 square feet.

WD 461/DT 2395: 10, 125 square feet.

---

[21]     The leases for Winn-Dixie stores 514 and 577 allow Dollar Tree to dedicate up to 1,000 square feet of sales area for the sale of Restricted Products.

WD 463/DT 153: 10, 800 square feet.

WD 471/DT 4637: 9,800 square feet.

WD 501/DT 4266: 7,800 square feet.

WD 514/DT 3382: 9,504 square feet.

WD 577/DT 4625: 10,103 square feet.

WD 599/DT 2936: 12, 232 square feet.

WD 632/DT 4339: 13,000 square feet.

WD 647/DT 4511: 10,800 square feet.

WD 656/DT 4230: 8,048 square feet.

WD 657/DT 807: 9,500 square feet.

WD 658/DT 4550: 9,100 square feet.

WD 678/DT 4181: 8,450 square feet.

WD 737/DT 986: 10,477 square feet.

WD 2205/DT 2714: 10,700 square feet.

WD 2230/DT 892: 10,981 square feet.

WD 2311/DT 332: 13,000 square feet.

Upon a review of the storeroom measurements and the sales area dedicated to the sale of Restricted Products at these locations, it is apparent that none of the above-mentioned stores are utilizing more than ten percent of their respective storerooms to sell Restricted Products.  Thus, by Plaintiffs' investigators' own measurements, Dollar Tree is not violating Winn-Dixie's grocery exclusive at the above-mentioned twenty-seven (27) locations and therefore Winn-Dixie is not entitled to injunctive relief.  Accordingly, there are only three remaining Dollar Tree

locations to consider whether a violation of the grocery exclusive has occurred.

### 2.    WD 236/DT 4365

Winn-Dixie store 236's lease contains the standard restrictive covenant except that it only permits other tenants to dedicate 400 square feet of sales area to the sale of Restricted Products. Dollar Tree store 4365 is co-located with Winn-Dixie store 236. At trial, Plaintiff's investigator Maureen Collado offered testimony indicating that Dollar Tree store 4365 dedicates 593 square feet of sales area to the sale of Restricted Products. (Trial Tr. 30, May 16, 2012). Since Winn-Dixie store number 236's lease only allows other tenants to sell Restricted Products in up to 400 square feet of sales are, Ms. Collado's testimony suggests that Dollar Tree store number 4365 is violating Winn-Dixie's grocery exclusive. However, it was evident at trial that Ms. Collado's measurements contain some gross inaccuracies. First, Ms. Collado testified that the total square footage of Dollar Tree store number 4365 is 14,000 square feet. (*Id.* at 30). However, Dollar Tree store 4365's floor plan indicates that the total space leased is only 10,813 feet and the sales floor area is only 8,953 square feet. (DT Ex. 169). Thus, Ms. Collado's measurement of sales area is off by approximately sixty four percent. Second, Ms. Collado's measurements of the footprints of the shelving units in the store are also grossly inaccurate. Ms. Collado measured each of the footprint aisles (or gondola runs) of the store to be forty (40) feet long. (Trial Tr. 33, May 16, 2012). However, this store's floor plan indicates that each of the aisles is only thirty-two (32) feet in length. Accordingly, I find that Ms. Collado's measurements are not sufficient to demonstrate that Winn-Dixie has a clear legal right to injunctive relief. After trial I attempted to reconcile Ms. Collado's measurements with Dollar Tree store 4365's store map. In doing so, I

concluded that this store's sale of Restricted Products is likely very close to the 400 square feet of sales area limit, although it was difficult to obtain a precise measurement.  Accordingly, Dollar Tree store number 4365 is ordered to measure the sales area dedicated to the sale of Restricted Products in its store within thirty (30) days of the date of this Order to ensure that it is in compliance with Winn-Dixie's restrictive covenant.

### 3.     WD 254/DT 723

The lease for Winn-Dixie store number 254 does not contain the standard grocery exclusive.  Rather, Winn-Dixie assumed a Pueblo lease, which was signed in June 1984, in 2003. Thus, despite the fact that Winn-Dixie arrived in this shopping center after Dollar Tree opened in 1993, Winn-Dixie's assumed restricted covenant still applies to Dollar Tree.  The restrictive covenant for Winn-Dixie store 254 provides:

> Landlord shall not lease, rent or permit to be occupied as a grocery or supermarket store,   any premises in the Shopping Center . . . and Landlord shall not permit any occupant or occupants of the Shopping Center . . . to sell meats, produce, cheese, poultry, fish, dairy, grocery or delicatessen products, or any other products customarily sold in grocery stores or supermarkets.

(Pl. Ex. 113).  Thus, the restrictive covenant for Winn-Dixie store number 254 prohibits the sale of any products typically sold by a grocery or supermarket.  Plaintiff's investigator testified that on the day she investigated Dollar Tree store number number 723, it used 439.5 square feet of sales area for the sale of Restricted Products.  (Trial Tr. 33, May 16, 2012).  That Dollar Tree sells Restricted Products at this location is confirmed by the floor plan for this location, which indicates that several aisles are dedicated to selling cookies, crackers, drinks, snacks, chips, and other items defined by this Court as Restricted Products. (DT Ex. 169).  Thus, I find that Dollar

Tree store 723 is in violation of Winn-Dixie's restrictive covenant and Winn-Dixie has

established a clear legal right to injunctive relief.  Accordingly, Dollar Tree store number 723 is

ordered to comply with the restrictive covenant within thirty (30) days of this Order by removing

all Restricted Products from its store.

### 4.    WD 705/DT 1805

The restrictive covenant for Winn-Dixie store 705 provides:

> The Landlord agrees that, if it owns or controls any property located within five
> hundred (500) feet of the demised premises, it will not, without the written
> permission of the Tenant, directly or indirectly, lease or rent such property to any
> person, firm or corporation to be used for or occupied by any business dealing in
> or which shall keep in stock or sell any staple or fancy groceries, meats, fish,
> fruits, vegetables, dairy products, bakery goods, or frozen foods; nor will the
> Landlord permit any tenant of such property to be sublet in any manner, directly or
> indirectly, any such property to any person, firm or corporation to be used for or
> occupied by any business dealing in or which shall keep in stock or sell any of the
> above listed items.

Winn-Dixie did not offer any evidence at trial that Dollar Tree store 1805 is located on property

owned by the Landlord within five hundred feet of this particular Winn-Dixie.  However, at trial

Winn-Dixie and Dollar Tree stipulated that another restrictive covenant recorded in Polk County,

Florida does apply to Dollar Tree store 180.  (Trial Tr. 79-80).  This restrictive covenant

provides:

> The parties agree that Winn-Dixie shall have the exclusive right to operate a
> supermarket within the Shopping Center and that no portion of the Grove parcels
> attached hereto as Exhibit "B" shall be used, occupied, leased or rented directly or
> indirectly for occupancy as a supermarket, grocery store, meat market, fish
> market, fruit or vegetable vendor, bakery, delicatessen, or other business which
> keeps in stock or sells for off-premises consumption any staple or fancy food as a
> primary business.

This is the same cross-easement discussed with regard to Dollar General store number 9263, *supra* Part V.B.3.b.  For the reasons stated therein, I find that this restrictive covenant is incapable of enforcement under Fed. R. Civ. P. 65(d) since it would be impractical, if not impossible, to enjoin Dollar Tree from selling Restricted Products as "a primary business" because of this phrase's ambiguous meaning and the restrictive covenant's lack of any guidelines of how to enforce such a covenant.  *See supra* Part III.C, Part V.B.3.b.

### D.    BIG LOTS STORES

At oral arguments on August 7, 2012, the parties confirmed that Big Lots store number 570, co-located with Winn-Dixie store number 612, closed in January 2012.  Accordingly, I need only consider whether Winn-Dixie is entitled to injunctive relief at the thirteen (13) Big Lots stores still open.

### 1.    BIG LOTS STORE 505 IS NOT VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORT

Winn-Dixie's investigator offered evidence indicating that Big Lots dedicated 472 square feet of sales area to the sale of Restricted Products Big Lots store number 505, co-located with Winn-Dixie store number 506.  (DE 580-6 at 19).  Winn-Dixie store number 506's grocery exclusive permits Big Lots to sell Restricted Products in up to 500 square feet of sales area.  Accordingly, it is evident that even by Plaintiffs' own measurements, Big Lots store number 505 is not violating Winn-Dixie's Restricted Product square footage requirement.  Furthermore, Big

Lots store number 505's lease provides that the total square footage of that store is 25,000 square feet.  Thus, it is apparent that Big Lots store number 505 is not utilizing more than ten percent of its storeroom to sell Restricted Products.  Accordingly, Winn-Dixie has failed to show a clear legal right to injunctive relief against Big Lots store number 505.

### 2.  BIG LOTS STORES VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT BY LESS THAN FIFTY FEET ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS

Plaintiff's investigators offered evidence indicating that Big Lots dedicates the following amount of sales area to the sale of Restricted Products:

WD 160/BL 558: 543 square feet.  (DE 580-12 at 4).

WD 307/BL 555: 538 square feet.  (DE 580-1 at 9).

WD 654/BL 530: 544 square feet.  (DE 580-16 at 70).

WD 2210/BL 512: 546 square feet.  (Trial Tr. 147-48, May 15, 2012).

Winn-Dixie's grocery exclusives for the above-mentioned store locations permit Big Lots to sell Restricted Products in up to 500 square feet of sales area.  Accordingly, it is evident that by Plaintiffs' investigator's measurements, Big Lots' sales of Restricted Products at these store locations are violating Winn-Dixie's grocery exclusives.  However, as each investigator who testified at trial stated, these measurements are estimates.  (Trial Tr. at 80, May 15, 2012).  For instance, Mr Adamo, who investigated Big Lots store number 307, apparently performed two inspections of this same store and came up with two different measurements for the total footprint of Restricted Products:  538 square feet in one measurement and 562 square feet in another measurement.  (DE 595 at 4-5).  Furthermore, the investigator's estimated measurements

48

of the gross square footage of the stores were substantially different than the actual square footage of the stores.  Mr. Morand stated in his investigator report that the gross square footage of Big Lots store number 558 was 19,200 square feet while it is actually 34,400 square feet.  (DE 595 at 25-26).  Mr. Walker stated in his investigator report that the gross square footage of Big Lots store number 230 was 21,600 square feet while it is actually 25,600 square feet.  (DE 595 at 47).  Finally, Mr. Adamo stated in his investigator report that the gross square footage of Big Lots store number 555 was 4,950 square feet while it is actually 21,580 square feet.  (DE 595 at 6).  Recognizing that there is some error in the investigators' measurements of the sales area of Restricted Products, I find that Winn-Dixie has not demonstrated a clear legal right to injunctive relief at these Big Lots store locations.  However, Big Lots is ordered to measure the amount of sales area dedicated to the sale of Restricted Products at these store locations within thirty (30) days of the date of this Order to ensure that they are in fact not violating Winn-Dixie's grocery exclusives and to come into compliance if necessary.

### 3.   BIG LOTS STORES VIOLATING WINN-DIXIE'S RESTRICTIVE COVENANT BY MORE THAN FIFTY FEET ACCORDING TO PLAINTIFFS' INVESTIGATOR REPORTS

Plaintiff's investigators offered evidence indicating that Big Lots dedicates the following amount of sales area to the sale of Restricted Products:

WD 236/BL 553: 644 square feet.  (Trial Tr. 212-13, May 15, 2012).

WD 302/BL 1711: 728 square feet.  (Trial Tr. 218, May 15, 2012).

WD 306/BL 1519: 554 square feet.  (Trial Tr. 223, May 15, 2012).

WD 348/BL 1628: 717.75 square feet.  (Trial Tr. 227-28, May 15, 2012).

WD 609/BL 550: 620 square feet.  (DE 580-16 at 60).

Winn-Dixie's grocery exclusives prohibit Big Lots from selling more than 500 square feet of Restricted Products at these locations.[22]  Thus, Plaintiffs' investigators' reports indicate that Big Lots is violating Winn-Dixie's restrictive covenant at each of these locations.  I recognize that the investigators' measurements of the sales area dedicated to the sale of Restricted Products are estimates and that there likely is some error.  This error is reflected by the fact that most of the investigators were unable to accurately estimate the area of the respective storerooms.  However, overall I find the investigators' methods and measurements to be reasonable estimations of the sales area dedicated to the sale of Restricted Products and Big Lots has not provided this Court with any alternative measurement.  Accordingly, I find that Winn-Dixie has demonstrated a clear legal right to injunctive relief at these locations.  Therefore Big Lots stores numbers 553, 1711, 1519, 1628, and 550 are enjoined from selling more Restricted Products than allowed under the respective Winn-Dixie leases.  Big Lots is ordered to comply with the restrictive covenants in the respective Winn-Dixie leases within thirty (30) days of the date of this Order.

### 4.    WD 254/BL 4258

Winn-Dixie store 254 contains a nonstandard grocery exclusive.  The grocery exclusive in this lease provides:

> Landlord covenants that from and after the date hereof until the earlier of (I) the end of the Term or (ii) the date ("Cessation Date") on which the use of . . . the Demised Premises as a supermarket . . . shall have been discontinued for a period in excess of eight consecutive months . . . .  Landlord shall not lease, rent or

---

[22]    The lease for Winn-Dixie store number 236 prohibits other tenants from selling Restricted Products in more than 400 square feet of sales area.

permit to be occupied as a grocery or supermarket store,     any premises in the Shopping Center . . . and Landlord shall not permit any occupant or occupants of the Shopping Center . . . to sell meats, produce, cheese, poultry, fish, dairy, grocery or delicatessen products, or any other products customarily sold in grocery stores or supermarkets.

Thus, the restrictive covenant for Winn-Dixie store number 254 prohibits the sale of any products typically sold by a grocery or supermarket.  Winn-Dixie initially conceded that this lease does not explicitly provide that this covenant runs with the land.  (DE 134 at ¶ 9, Case No. 9:11-cv-80641).  However, after examining the lease at issue and discussing its provisions with counsel at oral argument, it seems apparent that the lease does contain such a clause.  Paragraph (c) of Section 14 of the lease titled "Restrictive Covenants" states:

> Landlord expressly agrees that the covenants contained in this Section are intended to run with all lands affected thereby, and in furtherance of such purpose Landlord, at the request of tenant, shall execute, acknowledge and deliver to Tenant an instrument . . . to give constructive notice of such covenants . . . .

(DE 78-6 at 107, Case 9:11-cv-80638).  Furthermore, the lease states:

> Provided that the Cessation Date has not occurred, Tenant shall have the right to bring an action or proceeding against any occupant or occupants of any portion of the Shopping Center for injunctive or other relief, in its own name or in the name of Landlord, to enforce Tenant's right under any of the provisions of Section 14(a), if Landlord shall have refused, or after a reasonable period of time Landlord shall have refused, to bring such action or proceeding.

(*Id.*).  Thus, I find that the lease for Winn-Dixie store number 254 does explicitly provide that its grocery exclusive should run with the land and therefore is enforceable against Big Lots under Florida law.[23]  Plaintiffs' investigator report indicated that this store location dedicated 556.6

---

[23]      Big Lots points to other language in the lease that it contends makes this covenant personal to Winn-Dixie and therefore not enforceable against Big Lots.  Having considered the matter, I find that this language does not contradict the above-mentioned language and that the parties' intent to create a real covenant running with the land is clear from the grocery exclusive

square feet of sales area to the sale of Restricted Products in violation of Winn-Dixie's grocery exclusive.  (Trial Tr. 106, May 15, 2012).  Accordingly, I hereby enjoin Big Lots store number 4258 from selling any Restricted Products at this location.  Big Lots store number 4258 has thirty (30) days from the date of this Order to comply with this injunction by removing all Restricted Products from its store.

### 5.      WD 698/BL 525

The lease for Winn-Dixie store 698 contains the typical grocery exclusive providing:

> Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant.

However, the restrictive covenant does not allow other tenants to sell a certain amount of Restricted Products.  Plaintiffs' investigator reported that Big Lots store 525, which is co-located with Winn-Dixie store 698, was selling 585 square feet of Restricted Products.  (DE 580-16 at 81).  Since the restrictive covenant does not permit this Big Lots store to sell any Restricted Products, I find that Big Lots store 525 is violating Winn-Dixie's grocery exclusive.

Big Lots argues that additional language in the grocery exclusive makes it a personal obligation undertaken by the landlord, not encumbrances on the property itself.  This language states:

> Landlord further covenants and agrees to use its best efforts, and avail itself of any and all legal remedies available to it to prevent any property located within the shopping center from being used for or occupied by any business dealing in or

_____

in Winn-Dixie store number 254's lease.

> which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods or frozen foods without written permission of the Tenant.

Despite this additional language, I find that it is clear from the lease that the parties intended the covenant run with the land and therefore is a restrictive covenant enforceable against Winn-Dixie.  The lease contains a clause stating:

> This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto.  Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

Under Florida law, the requisite intent that a covenant run with the land exists where such a clause is contained in the lease.  *See Winn-Dixie*, 964 So. 2d at 265 (finding that an identical clause indicates that the parties intended the covenant run with the land).  Thus, I find that Winn-Dixie may enforce its restrictive covenant against Big Lots and hereby order it to comply with Winn-Dixie's grocery exclusive at this location by removing all Restricted Products from Big Lots store number 525 within thirty (30) days of the entry of this Order.

### 6.  WD 671/BL 554

Winn-Dixie store number 671 also contains a nonstandard grocery exclusive in its lease.  Its restrictive covenant provides:

> Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the above-described shopping center.  Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within said shopping center shown on Exhibit "A" and described on Exhibit "B" or within 500 feet of any exterior boundary thereof for occupancy as a grocery store, meat, fish or vegetable market; nor will the Landlord permit any tenant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in such business without

> written permission of the Tenant; provided this provision shall not be construed to prohibit the sale of food items by a drug store, department store or variety store when such sales are only incidental to the primary operations normally conducted by such business.

Plaintiffs' expert Mr. Reynolds testified that Big Lots is not a supermarket, grocery store, meat, fish or vegetable market.  (Trial Tr. 12-13, May 18, 2012).  Nevertheless Winn-Dixie contends that Big Lots is violating this grocery exclusive because its sale of food items are not incidental to their primary operations.  As stated previously, I find that the term "incidental" is ambiguous and incapable of enforcement under Fed. R. Civ. P. 65(d).  *See supra* Part III.C.  The restrictive covenant clearly allows other tenants to sell some food items and there is no way for this Court to effectively enforce such a restriction without inventing a bright line standard that even Plaintiffs' expert agrees does not exist.  Accordingly, I find that the restrictive covenant is vague and ambiguous and therefore Winn-Dixie may not enforce it against Big Lots store number 554.


## VI.   AFFIRMATIVE DEFENSES

The parties each asserted several different affirmative defenses in their Answers to Plaintiffs' Complaints.  Since each Defendants' defenses are based on specific and independent facts and circumstances, I will consider them separately.


### A.   DOLLAR GENERAL

This Court granted summary judgment in favor of Winn-Dixie on Dollar General's First, Second, Seventh, Thirteenth, and Seventeenth Affirmative Defenses.  (DE 169, Case No. 9:11-cv-80601). Having failed to amend its affirmative defenses and having presented no material

evidence during the trial in support of Dollar General's Third, Fourth, Sixth, Eighth, Ninth, Tenth,

Eleventh, Twelfth, Fifteenth, And Sixteenth Affirmative Defenses, I find in favor of Winn-Dixie on these defenses.

Dollar General's Fifth Affirmative Defense asserts laches as a defense. The elements of an affirmative defense of laches are: (1) conduct on the part of Defendant giving rise to the situation upon which the complaint is based; (2) Plaintiffs knew of the conduct and did not assert their rights by initiating a lawsuit; (3) Defendant did not know that Plaintiffs would now assert their right to restrict Defendant's activities as Plaintiffs have done is this lawsuit; and (4) Defendant will be injured if Plaintiffs are afforded the relief sought in this lawsuit. *See Lennar Homes, Inc. v. Dorta-Duque*, 972 So. 2d 872, 879 (Fla. 3d DCA 2007). I find by a preponderance of the evidence that Dollar General has failed to demonstrate the applicability of this equitable defense.

The evidence shows that Dollar General is a sophisticated commercial business with 9,600 stores in dozens of states, many of which are located in shopping plazas. Dollar General often sought and secured commercial exclusives in its own leases to protect itself, its legitimate business interests, and its investment in leased locations from competition. Dollar General's leases often explicitly reflect that Winn-Dixie is an anchor tenant in the relevant locations. For that reason, Dollar General was or should have been aware that anchor tenants like Winn-Dixie typically secure restrictive covenants in shopping center leases. By the same token, as this Court already ruled, Dollar General is charged with knowledge of Winn-Dixie's grocery exclusives, as documents reflecting those exclusives were filed in the Official Public Records of each of the

relevant jurisdictions.

Furthermore, Dollar General was also aware that Winn-Dixie was actively enforcing its exclusives.  For example, litigation over Winn-Dixie's exclusives at various locations has resulted in several appellate decisions.  *See, e.g.*, *Dolgencorp, Inc. v. Winn-Dixie Stores, Inc.*, 2 So. 3d 325 (Fla. 4th DCA 2008); *Dolgencorp, Inc. v. Winn-Dixie Stores, Inc.*, 988 So. 2d 1287 (Fla. 5th DCA 2008); *Winn-Dixie Stores, Inc. v. Dolgencorp, Inc.*, 964 So.2d 261 (Fla. 4th DCA 2007); *Winn-Dixie Stores, Inc. v. 99 Cent Stuff-Trail Plaza, LLC*, 811 So. 2d 719, (Fla. 3d DCA 2002).  Indeed, Dollar General itself was the defendant in most of those actions.

Moreover, Winn-Dixie has put on evidence that, over the years, several other cases were brought against this and other defendants over its grocery exclusives.  Winn-Dixie ultimately dismissed some of those actions, though the dismissals were all explicitly without prejudice.  Nonetheless, Dollar General continued to violate Winn-Dixie's grocery exclusives.  Dollar General's actions under these circumstances demonstrate the kind of unclean conduct for which the application of the doctrine of laches is inappropriate.  *See Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1105 (Fla. 5th DCA 2006) ("The equitable defenses of waiver and laches require clean hands . . . .").

Even if equitable relief were otherwise available to Dollar General, Dollar General is not entitled to injunctive relief under the evidence on this case.  For laches to apply, the defendant has the burden of proving its application "by very clear and positive evidence."  *Goodwin*, 939 So. 2d at 1105; *Kornaker v. Payor*, 565 So. 2d 899, 900 (Fla. 5th DCA 1990); *Smith v. Branch*, 391 So. 2d 797, 798 (Fla. 2d DCA 1980).  Moreover, "[l]aches may be applied before the statute of limitations expires only where strong equities appear."  *Appalachian, Inc. v. Olson*, 468 So. 2d

266, 269 (Fla. 2d DCA 1985); *Goodwin*, 939 So. 2d at 1105; *Smith*, 391 So. 2d at 798; *see also*

*Briggs v. Estate of Geelhoed*, 543 So. 2d 332, 333 (Fla. 4th DCA 1989) ("It has generally been

held that laches does not come into play until the period prescribed by the applicable statute of

limitations has expired."). Where the statute of limitations has not yet run, "equity will follow

the law and apply the statute of limitations" unless "the equities are unequal." *Tower v.*

*Moskowitz*, 262 So. 2d 276, 279 (Fla. 3d DCA 1972).

> The Court has already ruled that the continuing tort theory applies in this case, meaning

that the statute of limitations has not run for the violations for which relief is sought in this case.

As a result, Dollar General must demonstrate "by very clear and positive evidence" that "strong

equities" favor the application of laches. Dollar General has not met that burden here. Initially,

the equities here between Winn-Dixie and Dollar General are by no means unequal. Both are

sophisticated companies with a thorough understanding of leases and exclusives. Because the

equities are not unequal, the statute of limitations governs the application of laches here. As the

statute of limitations has not run, laches is not applicable.

> And even if this Court were to review the four elements necessary to show laches, none

of them favor Dollar General here. *See Wing*, 464 So. 2d at 1344. Even apart from its own

knowledge and actions, Dollar General can point to no positive evidence from which any

reasonable person would conclude that Winn-Dixie decided not to enforce its rights at a

particular location. Instead, Dollar General has essentially relied only on Winn-Dixie's silence,

which is insufficient to invoke laches. *Tower*, 262 So. 2d at 279 ("The rule is well-settled that

the bar of laches will not be raised solely because of the passage of time."). Dollar General

presented no credible evidence that it relied on any overt or implied action by Winn-Dixie in

executing or renewing its leases as to any of the store locations at issue.  To the contrary, the default notices and estoppel certificates demonstrate either that Winn-Dixie had no knowledge of a violation at that particular point in time or that Winn-Dixie was attempting to enforce its grocery exclusives.

The lack of any evidence as to a particular store location is likewise a bar to this equitable defense.  *Chick-Fil-A, Inc. v. CFT Dev., LLC*, 652 F. Supp. 2d 1252, 1263 (M.D. Fla. 2009) ("Any inaction by Chick-fil-A or non-enforcement of restrictive covenants other than the Mt. Dora Covenant is insufficient to establish an estoppel to enforce that covenant.").

The Court finds in favor of Winn-Dixie on Dollar General's equitable affirmative defenses, including laches.


### B.   BIG LOTS

Big Lots raised the same affirmative defenses in its Answer as Dollar General.  (DE 31, Case No. 9:11-cv-80641).  I previously granted summary judgment in favor of Winn-Dixie on Big Lots' First, Second, Seventh, Thirteenth, and Seventeenth Affirmative Defenses.  (DE 194, Case No. 9:11-cv-80641).  Having failed to amend its affirmative defenses and having presented no material evidence during the trial in support of Dollar General's Third, Fourth, Sixth, Eighth, Ninth, Tenth, Eleventh, Twelfth, Fifteenth, And Sixteenth Affirmative Defenses, I find in favor of Winn-Dixie on these defenses.

Big Lots' Fifth Affirmative Defense asserts laches as a defense.  For the same reasons I rejected Dollar General's defense of laches, I find by a preponderance of the evidence that Big Lots has failed to demonstrate the applicability of this equitable defense.  First, Big Lots is an

experienced, sophisticated commercial tenant with over 1,400 lease locations in 48 states.  Big

Lots frequently encounters shopping center exclusives in shopping centers where it does business

and it will seek a modification or waiver of other tenants' exclusives if it is unable to comply

with the restriction.  (Trial Tr. 55-57, May 17, 2012).  If it does not receive the waiver, it will not

open its Big Lots store at that location.  (*Id.*).  In fact, on at least one occasion, Winn-Dixie

refused Big Lots' request to open a store and offer Restricted Products in excess of what was

permitted by the applicable grocery exclusive.  (Pls. BL Ex. 160).  For that reason, Big Lots was

or should have been aware that anchor tenants like Winn-Dixie typically secure restrictive

covenants in shopping center leases.  Second, I find that Big Lots simply has not met the high

burden necessary to be entitled to the defense of laches.  Big Lots did not offer any testimony at

trial suggesting that it relied on any overt or implied action by Winn-Dixie in executing or

renewing its leases at any of the store locations at issue.  Accordingly, I find in favor of Winn-

Dixie with regard to Big Lots' affirmative defenses.


### C.    DOLLAR TREE

Like Dollar General and Big Lots, Dollar Tree also raised the defense of laches.  In

support of its defense, Dollar Tree introduced into evidence numerous estoppel letters.  Winn-

Dixie receives estoppel letters from its landlords when they request information about whether

Win-Dixie is aware of lease violations.  (Trial Tr. 16, May 15, 2012).  Winn-Dixie typically

relies on its store directors and maintenance department to supply information for inclusion into

its estoppel letter response.  *Id.* at 17.  Winn-Dixie does not train or regularly ask its store

directors or maintenance personnel to inspect competitors for potential violations of Winn-

Dixie's grocery exclusives when responding to estoppel requests.  *Id.*  Notwithstanding, on occasion a store director may have been asked or was aware of a grocery exclusive violation in which case some information was included in the estoppel letter response.  *Id.* at 18.  Dollar Tree store number 723 is the only location which I granted an injunction at.  Dollar Tree contends that it renewed its lease at this location in 2008 in the absence of any objections from Winn-Dixie that Dollar General was violating any grocery exclusive.  (DT Ex. 105k).  Having considered the matter, I find that Dollar General has failed to meet its burden to justify  the application of laches here.  Simply put, there is no evidence that Dollar Tree relied on any overt or implied action by Winn-Dixie in executing or renewing its leases as to this, or any other store locations at issue.

Dollar Tree also raised affirmative defenses of waiver, abandonment, and equitable estoppel.  To raise the defense of waiver, "the party's conduct must establish clear relinquishment, and while conduct can imply waiver, the conduct relied upon to do so must make out a clear case of waiver.  Waiver does not arise merely from forbearance for a reasonable time." *Costello v. Curtis Bldg. P'ship*, 864 So. 2d 1241, 1244 (Fla. 5th DCA 2004).  Similarly, estoppel requires, among other things, "a representation as to a material fact that is contrary to a later-asserted position." *State v. Harris*, 881 So. 2d 1079, 1084 (Fla. 2004); *see also Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 773 (Ala. 1996); *Parke v. Peaceful Valley Property Owners Ass'n, Inc.*, 519 S.E. 2d 440, 442 (Ga. 1999).  For the same reasons already state, namely the lack of evidence that Dollar Tree relied on any overt or implied action by Winn-Dixie in executing or renewing its leases as to the store locations at issue and the default notices and estoppel certificates demonstrating that Winn-Dixie had no knowledge of a violation or that it was attempting to enforce its grocery exclusives, I find that Winn-Dixie had no intention of

waiving its rights under its grocery exclusives.  Accordingly, I find in favor of Plaintiffs with

regard to Dollar Tree's affirmative defenses.


**VII.    CONCLUSION**

This Court finds in favor of Defendants and against Plaintiffs on Count I of Plaintiff's

Complaint.  As discussed previously, Plaintiffs have failed to demonstrate what damages were

caused by Defendants' violations of their grocery exclusives.  With regard to Plaintiffs' second

count, I find that Plaintiffs are entitled to injunctive relief at those Defendant stores where

Plaintiffs demonstrated a clear legal right to relief as stated herein.  In addition to granting an

injunction at these store locations, Defendants are also instructed to measure the amount of sales

area dedicated to the sale of Restricted Products at those stores where Plaintiffs' investigators

indicated there was a violation, but I found that this evidence did not establish a clear legal right

to relief.  Defendants are ordered to comply with this Court's Order within thirty (30) days and to

notify this Court and Plaintiffs of their compliance thereafter.

DONE AND ORDERED in Chambers at West Palm Beach, Florida this 10th day of

August, 2012.

_____
DONALD M. MIDDLEBROOKS
cc:     Counsel of Record                    UNITED STATES DISTRICT JUDGE