**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

WINN-DIXIE STORES, INC., *et al.*          )
                                           )
     **Plaintiffs,**                       )
                                           )
     **v.**                                )          **Consolidated Case No.**
                                           )          **9:11-cv-80601-DMM**
BIG LOTS STORES, INC., an Ohio corp.,      )
                                           )
     **Defendant/Third-Party Plaintiff,**  )
                                           )
     **v.**                                )
                                           )
SARRIA HOLDINGS IV, INC.,                  )
                                           )
     **Third-Party Defendant.**            )
_____)

## OPINION AND ORDER

This action began in 2011 when Winn-Dixie Stores, Inc. and its affiliate companies ("Winn-Dixie") brought an action against several defendants, including Big Lots Stores, Inc. ("Big Lots"). The current dispute involves the third-party complaint Big Lots filed against its former landlord, Sarria Holdings IV, Inc. ("Sarria"), as well as Sarria's counterclaims against Big Lots. On April 18, 2016, I held a bench trial at which time documentary and testimonial evidence were presented. Based on the evidence presented, I make the following findings of fact and conclusions of law.

**I.     FINDINGS OF FACT**

1.     In late 2001, Big Lots began negotiating with Sarria's predecessor-in-interest, Watch Omega Holdings, L.P. ("Watch Omega"), to lease a space at one of Watch Omega's shopping centers, Homestead Plaza. (Cattano Testimony; Day Testimony; Pretrial

Stipulation at 8). Big Lots intended to use the space at Homestead Plaza for one of its stores, Store 1711. (Day Testimony).

2.     During this time, Winn-Dixie was a tenant at Homestead Plaza. (Pretrial Stipulation at 8). Winn-Dixie was granted a restrictive covenant including the exclusive right to operate a supermarket in Homestead Plaza. (Big Lots Ex. 5). This restrictive covenant was recorded by short form lease. (F. Sarria testimony).

3.     At trial, Vince Cattano testified. He is a current employee of Big Lots and was a divisional real estate manager for Big Lots at the time Big Lots began negotiating with Watch Omega. Cattano testified that he was involved in all business aspects relating to the negotiation between Big Lots and Watch Omega. Cattano testified that, as part of the negotiations, Big Lots requested that Watch Omega provide the exclusive use agreements that Watch Omega had with other tenants in Homestead Plaza. He also testified that it was standard practice for Big Lots to ask for such exclusives during negotiations with landlords and that it was not standard practice to run a title search for restrictive covenants in the area. He could not recall asking for the exact language of the exclusives.

4.     At some point during the negotiations, Exhibit F was created. Exhibit F purported to list the exclusive uses in Homestead Plaza. It is unclear exactly when Exhibit F was created, or who created the document. Steven Nordyke, Watch Omega's asset manager for Homestead Plaza at the time, testified that he could not recall who drafted Exhibit F, or if it was created by Watch Omega or Terra Nova (Watch Omega's managing property agent). (Nordyke Testimony; *see also* Cattano Testimony; F. Sarria Testimony). Stephen Katz, an attorney at Greenberg Traurig

who represented Watch Omega during the negotiations, also testified that he too was unsure where Exhibit F originated, but that Greenberg Traurig did not draft the document.

5.     Exhibit F described the Winn-Dixie exclusive as follows:

> Tenant shall have the exclusive right to operate a supermarket in the Center; LL agrees not to lease space to a tenant within 1,000 sq ft of the Premises for use as a supermarket, grocery store, or to sell for off premise consumption: stable [*sic.*] or fancy groceries, meat, fish, vegetable fruits, bakery goods, or frozen foods; Exclusive does not apply to tenant sales that do not exceed 500 sq ft. or 10% of the storeroom; except restaurants; except chain drugstore, the permitted sale of the above listed food items, beer and wine shall be expanded to 1,500 sq ft of sales area; exception of one package store [no larger than 3,200 sf and no closer than 200 ft from Tenant], only Tenant may sell beer and wine in the shopping center for off-premise consumption.  Tenant may operate a bakery/delicatessen in shopping center, except that one deli-restaurant combo not to exceed 5,000sf and no closer than 250 ft to tenant (Lease, 28)

(Big Lots Ex. 2 at 2).  The Parties would later learn that the description in Exhibit F did not match the actual exclusive use agreement between Winn-Dixie and Watch Omega.

6.     Cattano testified that he reviewed Exhibit F, believing that it was the actual language pulled from Winn-Dixie's exclusive use agreement.  He also testified that in most instances, Big Lots would receive a copy of the actual exclusive and that Big Lots regularly relied on the landlord for such information.  Cattano reviewed Exhibit F and concluded that the first clause of Exhibit F provided Winn-Dixie with the exclusive right to operate a supermarket in Homestead Plaza.  Cattano concluded that the exclusive's second and third clauses created an additional protection by further preventing tenants within 1,000 square feet of Winn-Dixie from selling more than 500 square feet of groceries.  Cattano understood the term "Premises" to mean the

Winn-Dixie premises and "(Lease 28)" to refer to the lease between Winn-Dixie and Watch Omega. Cattano further testified that he looked at Homestead Plaza's site plan, estimated an area of 1,000 square feet, and determined the additional restriction did not reach Store 1711.

7.     Cattano testified that each Winn-Dixie exclusive was different, and Big Lots would have to review each exclusive to determine whether Big Lots would be in conflict. Cattano testified that, in this case, had Big Lots known that it was subject to the actual restriction, Big Lots would not have executed the lease with Watch Omega. However, Cattano also testified that, at the time, Big Lots would not have been concerned about the 500 square foot limitation because its stores were not selling much food.

8.     Moreover, in the additional comments section of Big Lots' Real Estate Deal Summary, it appears Big Lots had considered this limitation, writing "WE NEED TO REVIEW WINN DIXIE'S EXCLUSIVE ON FOOD SALES. IT APPEARS WE WILL BE LIMITED TO 500 SQ FT OF FOOD SALES AND NO FROZEN FOODS." (Sarria Ex. 3 at 2). It is unclear whether these comments were written before or after Exhibit F was created. The Real Estate Deal Summary indicated that the date of committee approval was December 17, 2001. (*Id.* at 1).

9.     On May 16, 2002, a lease agreement (the "Lease") was executed between Big Lots and Watch Omega (Pretrial Stipulation at 8). The Lease contained a "USE" provision, which referenced Exhibit F (the "Use Provision"). The Use Provision provided:

> Subject to the Exclusive Uses listed in Exhibit F, attached hereto, in favor of other tenants of the Shopping Center as of the Effective Date of this

Lease, Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, and food herein referred to as "Permitted Use." Under no circumstances shall Tenant use the Demised Premises primarily as a grocery store or supermarket. Landlord represents and warrants to Tenant, as of the effective date of this Lease, that aside from those exclusives listed in Exhibit F attached hereto, no exclusive covenants or item/category restrictions granted to, or for the benefit of existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises for the Permitted Use, or the sale of any specific item typically sold in Tenant's stores.

(Big Lots Ex. 1 at 4).

10. Section 12 of the Lease contained an indemnity provision:

Landlord, its administrators, successors and assigns, hereby agrees to indemnify, defend and hold harmless Tenant . . . from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with (i) any occurrence in the shopping center and its common areas, except to the extent caused by the negligence or willful misconduct of tenant, its agents, contractors, employees, managers, successors or assigns, (ii), Landlord's or its agents', contractors', employees', managers', successors' or assigns' negligence or willful misconduct in the demised premises, or, (iii) the failure of Landlord, its administrators, agents, employees, managers, successors or assigns to fulfill landlord's obligations hereunder.

(Big Lots Ex. 1 at 15).

11. Section 18 of the Lease provided a covenant of quiet enjoyment:

So long as Tenant is not in default beyond any applicable notice and cure periods provided herin, of any of the terms, covenants, and conditions of this Lease, Landlord covenants, warrants, and agrees that Tenant's quiet use, operation and enjoyment of the Demised Premises in the manner contemplated by this Lease will not be disturbed . . . .

(Big Lots Ex. 1 at 18).

12. Section 20 of the Lease provided remedies for default. The Section defined default:

Each of the following events shall be a "Default" by Tenant under this Lease: (1) If Tenant shall fail to pay any Rent . . . . (2) If Tenant shall fail to observe or perform any other covenants and/or agreements for which it

is responsible hereunder, and such failure continues for thirty (30) days from the date Tenant receives written notice from Landlord . . . .

(Big Lots Ex. 1 at 19).  In the event of Default, Sarria had the right to take possession of the store.  (*Id.* at 20).

13.     Section 42 of the Lease provided for attorney fees:

> If either party shall employ an attorney to enforce or defend any of its rights or remedies hereunder in a court of law on account of any failure by either party to perform any covenant herein, or due to any violation or default in the performance of any obligation, term, provision, or condition hereof, then in such event, the non-prevailing party shall be responsible for the prevailing party's reasonable attorney's fees, and for such other reasonable costs and expense incurred in connection with such litigation, which shall be paid on demand.

(Big Lots Ex. 1 at 27).

14.     On August 8, 2003, Sarria purchased Homestead Plaza from Watch Omega.  (F. Sarria Testimony; Big Lots Ex. 208).  As part of that transaction, Watch Omega assigned the Lease to Sarria.  (Pretrial Stipulation at 8; Big Lots Ex. 208).

15.     In June 2004, Big Lots was notified that Winn-Dixie had contacted Sarria and alleged that Big Lots was violating Winn-Dixie's grocery exclusive.  (Cattano Testimony; F. Sarria Testimony).  On August 18, 2004, Big Lots sent a fax to Sarria's Attorney, Alan Burger, including a copy of Exhibit F and requesting a copy of the Winn-Dixie exclusive.  (Big Lots Ex. 16).  On September 24, 2004, Big Lots sent a letter to Sarria claiming that Exhibit F was not an accurate portrayal of Winn-Dixie's exclusive use and stating that Big Lots was seeking indemnity from Sarria.  (Big Lots Ex. 18, "Indemnity Letter").  Cattano testified that Big Lots never received a response to the Indemnity Letter.  Cattano claims Big Lots interpreted Sarria's silence to mean that Sarria had resolved the matter with Winn-Dixie.

16.     For the next several years, the issue of Winn-Dixie's exclusive and Exhibit F
remained unaddressed.  Big Lots paid rent and Sarria accepted it.  On May 4, 2007,
Big Lots exercised its option to renew the Lease.  (Big Lots Ex. 21).  The renewal
letter did not mention the Winn-Dixie exclusive.  Sarria did not respond to the
renewal letter.  Francisco Sarria, Sarria's corporate representative, testified at trial.
On the stand, he confirmed that, had Big Lots been in default of the Lease at that
time, this would have prevented Big Lots from renewing the lease.  Cattano testified
that Big Lots still considered Winn-Dixie's grocery exclusive to be an obstacle to Big
Lots' operation and enjoyment of the leased space as permitted in the Lease.
However, Kevin Day, Vice President of Real Estate for Big Lots, testified that Big
Lots' lease renewal summary did not mention the Winn-Dixie exclusive issue (Sarria
Ex. 8; *see also* Cattano Testimony).  Day further testified that the lease renewal
summary would not have referenced the Winn-Dixie exclusive unless it was critical
to the decision to renew the Lease.

17.     For approximately four more years, Big Lots remained a tenant at Homestead Plaza
without issue.  On June 1, 2011, Winn-Dixie sued Big Lots, alleging, *inter alia*, that
Big Lots was in violation of Winn-Dixie's grocery exclusive in 19 shopping centers
across the Southeast.  Big Lots then filed a third-party complaint against several
Third-Party Defendants, including Sarria.  (Big Lots Ex. 132).

18.     On January 27, 2012, Sarria sent a letter to Big Lots seeking rescission of the Lease
("Notice of Breach").  (Big Lots Ex. 46).  The Notice of Breach also contended that,
should rescission fail, Sarria advised Big Lots that Big Lots was in default of the
Lease for (1) "bringing action against [Sarria] as a result of [Big Lots'] own conduct"

7

and (2) "also by failing to operate [Big Lots'] business in a manner consistent with the Lease terms by violating the Winn[-]Dixie grocery exclusive."  (*Id.* at 1-2). Francisco Sarria testified that the conclusions Sarria made in the letter were not based on any investigation conducted by Sarria.   On February 23, 2012, Sarria filed a counterclaim against Big Lots.  (11-80601; DE 242).

19.   In May 2012, I presided over the trial for Winn-Dixie's claims against Big Lots.  On August 13, 2012, I entered Findings of Fact and Conclusions of Law in the underlying case, finding that Winn-Dixie's grocery exclusive at Homestead Plaza was a real property covenant running with the land and finding that Big Lots was in violation of that covenant.  I issued an injunction against Big Lots that limited the amount of "sales area" Big Lots could devote to the sale of "groceries" in its Homestead Plaza store to 500 square feet.  (Pretrial Stipulation at 11).

20.   On July 25, 2012, Big Lots informed Sarria that Big Lots was not renewing its Lease (Big Lots Ex. 54).  In January 2013, at the expiration of the Lease, Big Lots vacated Homestead Plaza.  (Cattano Testimony).

## II.   CONCLUSIONS OF LAW

Big Lots alleged multiple claims against Sarria based on breach of contract and misrepresentation.  Sarria, in turn, brought counterclaims for rescission, reformation, breach of contract based on reformation, and possession.  For the following reasons, neither Big Lots' nor Sarria has established entitlement to relief for any claim.

### a.  Big Lots' Claims against Sarria

Big Lots alleges four claims against Sarria:  breach of covenant of quiet enjoyment (Count I); breach of contract under the Use Provision (Count II);[1] indemnification (Count IV); and negligent misrepresentation (Count V).  (Big Lots Ex. 132).[2]

### i.  Breach of Covenant of Quiet Enjoyment

Big Lots first contends that Sarria breached the covenant of quiet enjoyment contained in Section 18 of the Lease.  According to Big Lots, Sarria expressly warranted that the operation of Store 1711 would not be restricted except by the terms contained within the Lease.  Big Lots acknowledges that this Court previously found Big Lots in violation of the actual Winn-Dixie exclusive.  However, Big Lots contends that the covenant of quiet enjoyment was only limited by the terms of the Lease, and under the terms of the Lease it was not bound by the actual exclusive.

Under Florida law, the elements of a breach of contract claim are "(1) a valid contract; (2) a material breach; and (3) damages." *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008).  A landlord is liable for breaches of a covenant of quiet enjoyment if the "landlord authorizes acts to be done which cause substantial injury to the tenant in the peaceful enjoyment of the demised premises and such a result is the natural and probable consequence of the acts so authorized." *Coral Wood Page, Inc. v. GRE Coral Wood, LP*, 71 So. 3d 251, 253 (Fla. 2d DCA 2011).

When interpreting contracts under Florida law, courts "will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that

---

[1] Big Lots originally alleged promissory estoppel (Count III).  Big Lots subsequently abandoned that claim at trial.
[2] I deemed the Proposed Second Amended Complaint as timely filed on February 16, 2012 (11-80641; DE 176)

does not do so.  Instead, courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none." *Bethany Trace Owners' Ass'n, Inc. v. Whispering Lakes I, LLC*, 155 So. 3d 1188, 1191 (Fla. 2d DCA 2014), reh'g denied (Jan. 23, 2015) (internal citations and quotations omitted); *see also City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) ("[W]e rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.").  If a "contract provision is clear and unambiguous, a court may not consider extrinsic or parol evidence to change the plain meaning set forth in the contract." *Spring Lake NC, LLC v. Figueroa*, 104 So. 3d 1211, 1214 (Fla. 2d DCA 2012).

**Limitation on the Covenant of Quiet Enjoyment.**  Here, the Lease contained an express covenant of quiet enjoyment.  However, the covenant of quiet enjoyment was limited to "Tenant's quiet use, operation and enjoyment . . . in the manner contemplated by this Lease." (Big Lots Ex. 1 at 18).  Thus, the covenant was limited by the terms of the Lease itself.  Big Lots' use of Store 1711 was, in turn, limited in the Use Provision in Section 4 of the Lease.  In Section 4, the use of the store was made "Subject to the Exclusive Uses listed in Exhibit F." (Big Lots Ex. 1 at 4).  Exhibit F provided a description of the Winn-Dixie exclusive with an apparent citation to the Winn-Dixie exclusive, "(Lease 28)."

"To incorporate by reference a collateral document, the incorporating document must [] specifically provide that it is subject to the incorporated collateral document." *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011)) (internal quotations omitted).  There is no dispute that Exhibit F was itself incorporated into the Lease.  (DE 1076-1 at 9; DE 1100 at 6).  However, the actual Winn-Dixie lease was not incorporated by reference. The Lease did not specifically provide that the Lease was subject to the Winn-Dixie exclusive—

it did not even name the document to which the term "(Lease 28)" referred. Thus, the covenant of quiet enjoyment was limited by the uses as described in Exhibit F, not the actual Winn-Dixie exclusive. In other words, the success of Big Lots' claim hinges on establishing that—even if it violated the Winn-Dixie exclusive—it did not violate the exclusive described in Exhibit F.

The relevant portion of Exhibit F provides:

"Tenant shall have the exclusive right to operate a supermarket in the Center; LL agrees not to lease space to a tenant within 1,000 sq ft of the Premises for use as a supermarket, grocery store, or to sell for off premise consumption: stable [sic.] or fancy groceries . . .; Exclusive does not apply to tenant sales that do not exceed 500 sq ft. . . .

(Big Lots Ex. 2 at 2). Neither the Lease nor Exhibit F define "Tenant," "Center," or "Premises."

Big Lots contends that it was not in violation of the exclusive as described in Exhibit F. Big Lots argues that, under Exhibit F, the "Tenant" is Winn-Dixie, the "Center" is Homestead Plaza, and the "Premises" is the space of the Winn-Dixie store. Big Lots contends that (1) it is not a supermarket under the first clause of Exhibit F and that (2) it was unambiguously outside the 1000 square feet perimeter of Winn-Dixie under the second clause. Thus, Big Lots contends it was not bound by either the supermarket prohibition or the 500 square foot sales restriction. According to Big Lots, when Winn-Dixie sued Big Lots to enforce the actual exclusive—which this Court enforced—Big Lots' use of Store 1711 was restricted beyond the terms of the Lease, thereby interfering with its quiet enjoyment of the property.

Sarria responds that Big Lots violated the exclusive in Exhibit F. Sarria does not dispute Big Lots' definition of "Tenant" or "Center," but responds that "Premises" could mean either the entirety of Homestead Plaza or the area of Big Lots' Store 1711. Sarria argues that the "1000 sq ft" restriction is ambiguous, as it is a measurement of area, not distance, and could be construed

in multiple dimensions, thereby lengthening or limiting the distance to which the exclusion applies.

**The Meaning of Exhibit F.**  As an initial matter, the term "1000 sq ft" is not ambiguous. In *Emergency Associates of Tampa, P.A. v. Sassano*, the Second District Court of Appeal of Florida reviewed a noncompetition provision in a sales agreement.  664 So. 2d 1000 (Fla. 2d DCA 1995).  The provision at issue restricted activity "anywhere within five (5) square miles of [the] existing operations."  *Id.* at 1001.  The trial court found the five square miles term to be ambiguous and, therefore, admitted extrinsic evidence.  *Id.*  The *Sassano* Court reversed the trial court.  The *Sassano* Court noted that a square mile "is a defined unit of area" and found the use of square miles to be unambiguous.  *Id.* at 1003.  Here, like the square mile provision in *Sassano*, the of use of square feet may have been "unique[]" but it was not ambiguous.  *Id.* at 1004.

Moreover, reviewing the plain language of Exhibit F, I find the only plausible reading of "Premises" to mean the premises of Homestead Plaza.  First, Premises cannot be read as the premises of Big Lots' Store 1711—Sarria provides no plausible rationale for why an exclusive to protect Winn-Dixie would be measured from another store's premises, especially when that other store had yet to be leased.

Likewise, "Premises" cannot mean the premises of the Winn-Dixie store, as such a definition is inconsistent with the first clause of the exclusive and would render the entire exclusive meaningless.  *See Homestead*, 760 So. 2d at 84.  As measured from Winn-Dixie's store, the exclusion would only reach Winn-Dixie's immediate neighbors—no other store in Homestead Plaza.  Such a reading is inconsistent with the first clause, which creates an exclusive right in the entirety of Homestead Plaza.

Big Lots contends that construing the 1000 sq ft provision as measured from the Winn-Dixie store does not render the first clause meaningless. At trial, Big Lots argued Exhibit F describes two types of exclusives: one exclusive that prohibits any supermarket from operating in the entirety of Homestead Plaza (based on the first clause); and a second exclusive prohibiting any store within 1000 square feet of Winn-Dixie from having more than 500 square feet of grocery sales (based on the second and third clauses). According to Big Lots, construing the 1000 sq ft provision from Winn-Dixie only limits the application of the 500 square foot sales restriction—not the general prohibition against supermarkets.

Nothing in Exhibit F indicates that Winn-Dixie had multiple types of exclusives. To the contrary, the 500 square foot sales restriction refers to a singular "Exclusive." (Big Lots Ex. 2 at 2). Moreover, the second clause does not reference an exclusive at all. Thus, Exhibit F refers to one exclusive; the second and third clauses simply define that exclusive.

Big Lots contends that such a reading is implausible because defining Premises in such a way would render Premises synonymous with Center. To the contrary, Center just as easily refers to the leased spaces in Homestead Plaza while Premises could extend farther, to the entirety of Homestead Plaza including unleased areas such as the parking lot.

Accordingly, under the terms of Exhibit F, the third clause limiting sales to 500 square feet applied to any store within 1000 square feet as measured from the premises of Homestead Plaza. This restriction, thus, applied to Big Lots' Store 1711. Under the Lease, Big Lots' use was limited by the same 500 square foot sales limitation as existed in the actual Winn-Dixie exclusive. When Winn-Dixie sued Big Lots to enforce the 500 square foot sales restriction, Big Lots' use was not interfered with beyond the terms already provided under Exhibit F. Thus, Sarria did not breach the covenant of quiet enjoyment.

### ii.  Breach of the Use Provision

Big Lots also claims breach of contract based on violation of the Use Provision. However, as explained *supra*, in Section II(a)(i), the Use Provision was limited by Exhibit F and Winn-Dixie interfered with Big Lots' use no more than provided in the Lease under Exhibit F.

### iii.  Indemnification

Big Lots next tried to prove breach of the indemnification clause of the Lease as well as indemnification under common law.  I first address Big Lots' claim under the indemnification clause.  Section 12 provides indemnification of Big Lots "from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with [] any occurrence in the shopping center . . . or . . . the failure of Landlord, its administrators, agents, employees, managers, successors or assigns to fulfill landlord's obligations hereunder."  (Big Lots Ex. 1 at 15).  It is unclear under which section of the indemnification clause Big Lots brings its claim, but it is apparently premised on the success of the breach or misrepresentation claims.  *See* (1076-1) (Big Lots' Motion for Summary Judgment) ("Sarria failed . . . to indemnify Big Lots. . . . Big Lots relied upon the representation made in Exhibit F and its reasonable understanding that Winn-Dixie's exclusive use provision would not operate to restrict Big Lots or subject Big Lots to liability for selling food items.").

Section 12 does not provide indemnification for Big Lots' purported damages, which were attorneys' fees and costs of defending itself against Winn-Dixie, as well as the costs to remodel the store to comply with my injunction.  None of these are covered under Section 12, as they are not "injur[ies] to or death of any person or damage to personal property."  (Big Lots Ex. 1 at 15).  Thus, any indemnity claim based on the Lease fails.

Big Lots also did not establish common law indemnity. Under Florida law, the elements of common law indemnity are "(1) the party seeking indemnity (the indemnitee) must be without fault and its liability must be solely vicarious for the wrongdoing of another, and (2) the party against whom indemnity is sought (the indemnitor) must be wholly at fault." *Heapy Eng'g, LLP v. Pure Lodging, Ltd.*, 849 So. 2d 424, 425 (Fla. 1st DCA 2003). Big Lots has not established that it is wholly without fault. Rather, the evidence presented at trial indicates that Big Lots had multiple opportunities to address the disparate language in Exhibit F. Further, while Sarria never established an ongoing violation of Exhibit F, Big Lots did not establish that it abided by Exhibit F and was wholly without fault. For these reasons, Big Lots did not establish either contractual or common law indemnity.

### iv. Negligent Misrepresentation

Finally, Big Lots brings a claim for negligent misrepresentation based, again, on the purported differences between Exhibit F and the actual Winn-Dixie exclusive. Under Florida law, a claim for negligent misrepresentation requires the plaintiff to show "(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation." *Howard v. Murray*, 184 So. 3d 1155, 1168 (Fla. 1st DCA 2015), reh'g denied (Feb. 26, 2016) (internal citations and quotations omitted).

Here, any minor differences between Exhibit F and the actual exclusive were not material. As discussed *supra*, in Section II(a)(i), both the exclusive described in Exhibit F and

the actual Winn-Dixie exclusive applied to Big Lots and limited the sale of groceries to 500 square feet.

Moreover, Big Lots' actions after it entered into the Lease indicate that the differences between Exhibit F and the actual exclusive were not material. When Big Lots learned of the discrepancy in 2004, it contacted Sarria. Sarria never responded to the issue. Rather than follow up to confirm the issue was resolved, Big Lots continued business as usual. Later, in 2007, Big Lots exercised its option to renew the Lease. At that time, Big Lots could have requested that Sarria amend the Lease to accurately reflect the Winn-Dixie exclusive. Kevin Day testified that an exclusive would be included in a lease renewal summary if it was critical to the decision to renew the Lease. Here, Big Lots' renewal documents do not refer to the exclusive. Big Lots was evidently not concerned about the discrepancy—it did not follow up with Sarria or seek to address the issue in the renewal process.

Finally, even if the differences were material, Big Lots did not prove that it justifiably relied on a misrepresentation. Cattano testified that, had Big Lots known it was subject to the actual restriction, Big Lots would not have executed the lease with Watch Omega. When questioned further, however, Cattano testified that Big Lots would not have been concerned about the 500 square foot sales limitation because Big Lots' stores were not selling much food at the time it executed the Lease. Because Big Lots did not establish that Sarria made a material misrepresentation, or that Big Lots relied on such a misrepresentation, Big Lots' negligent misrepresentation claim fails.[3]

---

[3] It is also unclear whether Watch Omega, in assigning Sarria the Lease, also assigned tort liability. Because Big Lots failed to establish a material misrepresentation, however, I need not address this issue.

16

### b.  Sarria's Counterclaims Against Big Lots

Sarria brought four counterclaims against Big Lots: rescission (Count I); reformation (Count II); breach of contract in the event of reformation (Count III); and possession (Count IV). (Big Lots Ex. 134).  Sarria has failed to prove any of its counterclaims.

### i.  Rescission and Reformation

Sarria seeks either rescission or reformation of the Lease due to a mutual mistake by the Parties as to the use of the "1,000 sq ft" term contained in Exhibit F.

In order to rescind or reform a contract, a party must establish there was a mutual mistake. *Markel Am. Ins. Co. v. Baker*, 152 So. 3d 86, 90 (Fla. 5th DCA 2014) ("A court of equity may reform a written instrument to the extent that the parties' intentions are not accurately expressed within the instrument due to [] a mutual mistake"); *Braman Dodge, Inc. v. Smith*, 515 So. 2d 1053, 1054 (Fla. 3d DCA 1987) ("Rescission of a contract is an adequate remedy where the parties to the contract labor under a mutual mistake which is material to the transaction.").

"Due to the strong presumption that a written agreement accurately expresses the parties' intent, the party seeking reformation based on a mutual mistake must prove its case by clear and convincing evidence." *Plantation Key Office Park, LLLP v. Pass Int'l, Inc.*, 110 So. 3d 505, 508 (Fla. 4th DCA 2013) (internal citations and quotations omitted).  "A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument." *Id.*

Here, Sarria presented no evidence indicating Big Lots and Watch Omega agreed that the "1,000 sq ft" provision in Exhibit F meant 1,000 linear feet.  Thus, Sarria has not established a mutual mistake.  Even if mutual mistake were established, because the 1,000 sq ft provision

extends from Homestead Plaza and not from Winn-Dixie, rescission would not impact the exclusive as it applied to Big Lots, which was within Homestead Plaza.

At trial, Sarria appeared to raise several other arguments, including that the mistake was so obvious that Big Lots should have known the 1,000 sq ft provision was a mistake. To the extent Sarria argues rescission based on a unilateral mistake, this argument fails because Sarria did not demonstrate the first element of a unilateral mistake, inducement. *Rachid v. Perez*, 26 So. 3d 70, 72 (Fla. 3d DCA 2010) ("Under Florida law, the party seeking rescission based on unilateral mistake must establish that: (1) the mistake was induced by the party seeking to benefit from the mistake . . . ."). In a similar vein, Sarria argued that Big Lots—instead of notifying Watch Omega of the mistake—decided to "snap up" the opportunity. This argument appears to rest on the premise that the mistake was so obvious that Big Lots should have known it was a mistake.[4] Although using square feet (as opposed to linear feet) may have been an unusual metric, it is still an unambiguous unit of measurement and not so obvious as to have put Big Lots on notice that there was a mistake. *Sassano*, 664 So. 2d at 1003 (Fla. 2d DCA 1995) (finding a non-compete clause extending "anywhere within five (5) square miles" of the previous place of employment was unambiguous).

Finally, Sarria argued it was entitled to recovery based on the wrongful act doctrine. "The wrongful act doctrine provides that where 'the wrongful act of the defendant has involved the [plaintiff] in litigation *with others*, and has placed the [plaintiff] in such relation with others as makes it necessary to incur expenses to protect its interests, such costs and expenses,

---

[4] Sarria provided no authority, and the Court is unaware of any, indicating Florida law recognizes this "snap up" theory. *But see Patterson v. CitiMortgage, Inc.*, No. 14-14636, 2016 WL 1696606, at *3 (11th Cir. Apr. 28, 2016) ("Georgia courts will not permit a party to take unfair advantage of an offer that contains an obvious, unilateral mistake. . . . There is no disposition in the law to let one 'snap up' another, or take an advantage of mistakes.") (interpreting Georgia law) (internal citations and quotations omitted).

including reasonable attorney's fees upon appropriate proof, may be recovered as an element of damages.'" *Schwartz v. Bloch*, 88 So. 3d 1068, 1071 (Fla. 4th DCA 2012) (emphasis added). Here, Sarria seeks attorneys' fees based on Big Lot's suit, not a suit by another party such as Winn-Dixie. There is no evidence Sarria was involved in litigation with anyone, including Winn-Dixie, as a result of Big Lots' selling more than 500 square feet of groceries. Thus, the wrongful act doctrine does not apply.

### ii. Breach of Contract in the Event of Reformation

Sarria also brings a claim for breach of contract, "[i]n the event that the Lease is reformed." (Big Lots Ex. 134 at 6). Because I reject Sarria's claim for reformation, Sarria's claim of breach of contract, which was made contingent on Sarria's succeeding on the reformation claim, also fails.[5]

At trial, Sarria moved to amend its pleadings to remove the limitation that its breach of contract claim was dependent on its reformation claim. I denied the motion. It is worth noting, however, that even if I had granted the motion, Sarria's breach of contract claim failed. Critical to Sarria's breach of contract claim is that Big Lots was selling groceries in excess of 500 square feet 30 days after its Notice of Breach. However, Sarria presented no evidence of grocery sales on February 26, 2012 (30 days after the Notice of Breach on January 27, 2012). Instead, Sarria sought to rely on my finding in the underlying case, where I held that Big Lots violated the Winn-Dixie exclusive. My finding in the underlying case was dependent on an investigator's report from 2011 (DE 622, "Findings of Fact and Conclusions of Law" at 49; DE 589, "May 15, 2012 Tr. Trans." at 216:1-25), and this is inapplicable to Sarria's breach of contract claim arising from actions occurring in 2012.

---

[5] In addition to the pleadings, at trial, Sarria's counsel confirmed that its breach of contract claim was premised on its rescission claim.

Moreover, Sarria did not establish any damages arising from the alleged breach. No evidence was presented that Winn-Dixie pursued legal action against Sarria or terminated its lease with Sarria.

### iii. Possession

Sarria also brought a claim for possession under Florida law. Sarria claims that under Florida Statute § 83.20(3), a landlord may bring a claim for possession "[w]here such person holds over without permission after failing to cure a material breach of the lease [], other than nonpayment of rent, and when 15 days' written notice requiring the cure of such breach or the possession of the premises has been served on the tenant." Fla. Stat. § 83.20(3). However, that subsection "applies only when the lease is silent on the matter" of possession. *Id.* Here, the Lease provided for possession in the event of default as defined in Section 20.

Section 20 provided that default occurred in the event that Big Lots failed to abide by the Lease "and such failure continue[d] for thirty (30) days" after written notice. (Big Lots Ex. 1 at 19).[6] Sarria contends it notified Big Lots of its failure to abide by the Lease when it sent the Notice of Breach on January 27, 2012. Sarria represented that Big Lots was in default for "bringing action against [Sarria] as a result of [Big Lots'] own conduct[,] and also by failing to operate [Big Lots'] business in a manner consistent with the Lease terms by violating the Winn[-]Dixie grocery exclusive." (Big Lots Ex. 46 at 1-2). However, Sarria has not established that Big Lots bringing an action against Sarria constitutes default under the Lease. Moreover, as discussed *supra*, in Section II(b)(ii), Sarria presented no evidence of grocery sales on February 26, 2012, instead relying on my finding in the underlying case. Thus, Sarria did not establish that Big Lots was in default of the Lease and that Sarria, in turn, had a right to take possession.

---

[6] The other circumstances provided for in the Lease relating to default are not relevant to the litigation.

### III.   Attorneys' Fees

At the close of trial, I ordered the Parties to brief the issue of attorneys' fees. Specifically, I stated: "I'm interested in both sides giving me a memo. Assuming you both lose on your claim[s], what do we do with attorneys' fees?" (Tr. Trans. at 135:5-8).

Section 42 of the Lease provides for a party's attorneys' fees incurred "to enforce or defend any of its rights or remedies hereunder in a court of law on account of any failure by either party to perform any covenant herein, or due to any violation or default in the performance of any obligation, term, provision, or condition hereof . . . ." (Big Lots Ex. 1 at 27). The provision determines the award of attorneys' fees based on the prevailing party: "the non-prevailing party shall be responsible for the prevailing party's reasonable attorney's fees, and for such other reasonable costs and expense incurred in connection with such litigation." (*Id.*).

Big Lots contends that, in the event the Parties both successfully defend their claims, "the Court is authorized under the terms of the Lease to assess the fees incurred by both parties and perform an applicable offset of those fees to determine who is entitled to an award." (DE 1194 at 12). Big Lots argues that, since it sought to voluntarily dismiss its case in 2012, any fees Sarria incurred after that point should not be considered in an offset. (*Id.*).

Sarria represents that, under Section 42, the only claims for which attorneys' fees may be awarded are claims under the Lease. (DE 1193 at 4). Sarria contends that all of its counterclaims were based in equity, and therefore, even if Big Lots successfully defended against those claims, Big Lots is not entitled to an award of attorneys' fees. (*Id.* at 8). Sarria

argues it successfully defended against Big Lots' claims and based on the "totality of circumstances," it is the prevailing party. (*Id.* at 9).[7]

Reviewing Section 42, attorneys' fees are awarded to "enforce or defend" claims based on any "covenant" or "of any obligation, term, provision, or condition" under the Lease. (Big Lots Ex. 1 at 27).   Sarria believes this language indicates that the types of claims raised by the Parties determines the availability of attorneys' fees.   However, Section 42 provides for a singular "prevailing" and "non-prevailing party."   (*Id.*).   In addition, Section 42 provides for the award of fees and costs "incurred in connection with such litigation," not in connection with each individual claim. (*Id.*).   Thus, Section 42 awards attorneys' fees to the overall "prevailing party" of the litigation. (*Id.*).[8]

Florida law generally prescribes "[w]here a contract provides attorney's fees for a prevailing party, the trial judge is without discretion to decline to enforce the provision." *Hutchinson v. Hutchinson*, 687 So. 2d 912, 913 (Fla. 4th DCA 1997).   "To determine which party prevailed, the court should focus on which one prevailed on the significant issues involved in the litigation. A measure of this test is the result obtained at the close of the case." *Sorrentino v. River Run Condo. Ass'n*, 925 So. 2d 1060, 1065 (Fla. 5th DCA 2006) (internal citations omitted).

---

[7] Sarria also argues that it should be awarded attorneys' fees based on a comparative fault theory. (*Id.* at 8).

[8] This is in line with Florida law reviewing similar contracts.   In *Merchants Bonding Co. v. City of Melbourne*, the Fifth District Court of Appeal reviewed a contract containing a provision similar to that of Section 42.   832 So. 2d 184, 185 (Fla. 5th DCA 2002).   In *Merchants*, the provision provided for attorneys' fees incurred in order to "enforce or defend any of the . . . rights or remedies" under the contract.   *Id.*   The *Merchants* Court affirmed the trial court's finding that there was no prevailing party based on review of the success of the various claims and counterclaims in the litigation.   *Id.*

22

However, where both Parties win and lose on significant issues, the "trial judge has discretion to determine no party prevailed in the litigation and it is proper to deny an award of attorney's fees under a prevailing party contract." *Brevard Cty. Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So. 2d 147, 151 (Fla. 5th 2002). *See also KCIN, Inc. v. Canpro Investments, Ltd.*, 675 So.2d 222 (Fla. 2d DCA 1996); *Newton v. Tenney*, 122 So. 3d 390, 392 (Fla. 4th DCA 2013) ("[T]here may be compelling circumstances in which a trial court determines that neither party prevailed in a breach of contract action."). For example, where "two parties [fight] to a draw; no one won and no one lost . . . the judge [has] the discretion to determine that no party prevailed." *Merchants*, 832 So. 2d at 186-87; *see also M.A. Hajianpour, M.D., P.A. v. Khosrow Maleki, P.A.*, 975 So. 2d 1288, 1290 (Fla. 4th DCA 2008) (affirming finding of no prevailing party where "the parties battled to a draw"). This is particularly true where "both contracting parties were at fault." *Merchants*, 832 So. 2d at 187.

Here, out of the remaining four claims and four counterclaims, none were successful. Big Lots won against all of Sarria's counterclaims but lost all its original claims. Sarria faired similarly. Moreover, neither party was without fault. Both Parties recognized there were discrepancies between exhibit F and the actual exclusive as early as 2004; both failed to remedy the issue. It was not until Winn-Dixie filed the underlying action against Big Lots that Exhibit F mattered to either of the Parties. Big Lots immediately pointed the finger at Sarria, filing the third party complaint claiming the Lease did not properly reflect the exclusive. Sarria, in turn, attempted to rescind the Lease and notify Big Lots of its default without any evidence to support such a contention. Although Big Lots attempted to walk away from the litigation in 2012, Sarria opposed a joint dismissal. Based on these circumstances, I find that neither party is the prevailing party and I, therefore, deny the award of attorneys' fees.

## IV.    Conclusion

Neither Big Lots nor Sarria has established entitlement to relief for any claim.  Moreover, I find that neither party is a prevailing party under the contract.  Accordingly, it is

**ORDERED AND ADJUDGED** that final judgment should be entered in favor of Sarria and against Big Lots as to Big Lots' claims.  Final judgment should be entered in favor of Big Lots and against Sarria as to Sarria's counterclaims.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this ___ day of May, 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE